UNITED STATES DISTRICT CORT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------X

GINA WILLIAMS,

       **Plaintiff,**     Civ. No. 18 Cv 5912  (RJS)

  **-against-**        **<u>AMENDED COMPLAINT</u>**

NEW YORK CITY HOUSING AUTHORITY,  **Jury Trial Demanded**
CAROLYN JASPER, CESAR GONZALEZ,
MATTHEW HOFFMAN, RODNEY DAVIS,
THELMA WATKINS

       **Defendants.**

------------------------------------------------X

   The amended complaint of the plaintiff Gina Williams respectfully

shows and alleges as follows:

  I  <u>PARTIES</u>

  1.  The Plaintiff herein, Gina Williams, Pro Se, is a resident of

the State of New York.  Ms. Williams resides at 146-17 182nd street

Springfield Gardens, New York 11413.

  2.  The defendant herein, New York City Housing Authority has

a principal place of business at 250 Broadway, New York, New York

10007.  Defendants Carolyn Jasper, Cesar Gonzalez, Matthew Hoffman,

Rodney Davis and Thelma Watkins, are engaged in the business of

housing development and renting.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/30/18

II.   **JURISDICTION**

3.     This Court has jurisdiction over this action.  Venue is proper as

Defendants' Office is located in 250 Broadway, New York, New York

10007.

4.     This is an action pursuant to 42 U.S.C. Section 1981, 42 U.S.C

section 1983, 42 U.S..C. Section 2000, 42 U.S.C. 1985 and Administrative

code to vindicate the civil rights of Plaintiff.  New York Executive Law

296 and Administrative code 8-107.  Plaintiff contends that defendants

altered the terms, conditions and privileges of her employment.

Plaintiff is adversely affected because of gender, race, retaliation, and

whistle blowing, and opposition of the aforementioned discriminatory

practices.  These was because of her employment violations are

on going in nature of retaliation and a hostile work environment.

5.     Plaintiff is an African American female.   Employed with the New

York City Housing Authority since May 1992.  Currently in the Civil

Service title Residential Building Superintendent since May 2013.

6.     April 2016 Plaintiff was arbitrarily transferred from her location

Beach 41street Houses to Pomonok Houses by The Director Carolyn

Jasper.  The transfer was gender bias and in violation of equal

protection law of the United States Constitution.  **See Exhibit A**

7.     Plaintiff is similarly situated to the male Superintendents Juan

Mercado and Benjamin Costa whom was not selected even though they

had the required time to be transferred from their locations.

Defendants were aware of the neglect, short staff and deplorable

conditions at Pomonok Houses.   There is evidence of these conditions

being long standing at Pomonok Houses. **See Exhibit B** News article

from Pomonok Houses Tenant Association President Ms. Corbett from

2014.  Defendants did not inform Plaintiff of deplorable conditions that

are present.  This is gender discrimination in violation of the 14th

amendment.  Prior to transfer Plaintiff had a good employment record.

**See Exhibit A.**

8.     On January 23, 2017 defendant Regional Asset Manager Cesar

Gonzalez acting under color of authority over plaintiff issued counseling

memorandum failure to perform duties.  **See Exhibit C.** Defendant New

York City Housing Authority was well aware of its custom and policy of

failing to provide adequate staffing, computer maximo work order

system, defects, and flaws.  This conduct is in conspiracy to injury

plaintiff in violation of 42 USC § 1983.

9.     Defendant NYCHA and all parties fail to send plaintiff back to

training.  NYCHA has a custom and policy of failing to adequate train its

employees in violation of 42 USC § 1983.  See United States v. NYCHA,

18 civ 5213  (WHP), Baez v. NYCHA, 13 civ 8916 (WHP)

10.     On January 30, 2017 Property Manager Xenia Rivera acting in

color of Authority issued Plaintiff a counseling memorandum for failure

to properly monitor work orders. **See Exhibit D**.  NYCHA has a custom

and policy of failing monitor and remedy work orders because of their

flawed system and inadequate staffing.  Ms. Rivera was demoted March

2017 and was unqualified.  This conduct was in violation of 42 USC §

1983.  NYCHA failed to issue training after issuing counseling

memorandum.

11.     Plaintiff wrote her Union Teamsters Local President Gregory

Floyd on February 8, 2017 and sent copies to NYCHA's Chairperson

Shola Olatoye on the conditions of her employment.  Chairperson Shola

Olatoye acknowledge the letter and responded. **See Exhibit E.**

This letter is protected by the first amendment of the United States

Constitution, Anti-retaliation laws and whistle blowing laws.

12.     Defendant Regional Asset Manager Hoffman issued Plaintiff

Counseling memorandum dated April 26, 2017 for failure to clean crawl

space which requires confine space entry permit.  **See Exhibit F.**
Defendant also instructed Plaintiff to pick up contaminated garbage
which requires certified trained workers.  Counseling Memo issued to
Plaintiff dated April 26, 2017 after Plaintiff's letter to Chairperson Shola
Olatoye dated February 8, 2017.

13.     This assignment issued by defendants Hoffman and Gonzalez to
clean crawl space was a health and safety violation and an attempted to
physically injury Plaintiff.  Defendants Hoffman, Jasper, Gonzalez and
Davis conduct towards Plaintiff  is in violation of 42 USC § 1983.  NYCHA
has a custom and policy of deceiving HUD and failing to comply with
Federal, State and City laws.

14.     Defendant NYCHA's and its agent Regional Asset Manager Gary
Hayatt June 26, 2017 conducted a local hearing against plaintiff based
on unlawful assignments and memorandums dated April 20, 2017 and
January 23, 2017.  NYCHA and defendants non-municipal employees
were aware of the federal State, City health and safety laws with these
assignments.  The defendants Davis, Hoffman and Gonzalez testified at
the local hearing.  Hearing Officer Fredericka Wilson stated that Plaintiff
should not have taken her little letter dated February 8, 2017 to the

Chair person Shola Olatoye.  This conduct made by the Neutral Officer Wilson shows retaliation and violation of the whistle blowing laws towards Plaintiff.

15.    Plaintiff was found guilty and received a reprimand which scars the employees record, prevents promotions and leads to termination. This conduct shows retaliation by defendants and aiding and abetting by defendants and neutral officer.  In violation of the New York City Administration Code 8-107. **See Exhibit G.**

16.    On December 22, 2017, Defendant Hoffman issued Plaintiff another counseling memorandum dated December 19, 2017, regarding unlawful assignment that requires a certified skill trade electrician to make the proper assessment. The counseling Memorandum was illegally issued to Plaintiff, Witness to the Memorandum was an employee in title lower than Plaintiff's title.  Plaintiff was humiliated in front of subordinate.   Mr. Hoffman was demoted in this same December 2017 and was unqualified supervisor. **See Exhibit H.**

17.    January 29, 2018 Plaintiff was issued another counseling memorandum by defendant Watkins acting under color of authority over plaintiff , in concert with Deputy Director Rodney Davis issued

plaintiff an unlawful assignment to inspect compactors and ensure the compactors are operating under manufactures specification. **See Exhibit I.** This assignment poses a health and safety risk to self and others, to inspect according to the manufactures specifications. It requires a certified technician. Defendant Watkins is a provisional Property Manager on probation and lacked training. This in violation of executive law 296 and N.Y.C. Administrative Code 8-107.

18.    May 7, 2018 Plaintiff was issued another counseling memorandum by defendant Watkins under color of authority for failure to supervise maintenance workers productivity which was the first time the new way was presented to the managers and superintendents on April 26, 2018 and had flaws. **See Exhibit J.** This new way is not accurate. This was documented by NYCHA's the Executive Vice President Cathy Pennington, under oath at the New York City Council Hearing on April 24, 2018 documenting the monitoring of the work order system is flawed. The old way of monitoring the work orders was through the SLA- Service level Agreement which Plaintiff was in compliance. Also NYCHA's General Manager Vito Mustaciuolo is documented making the same assessment of the work order system as flawed.

19.  Plaintiff was the only Superintendent to receive this counseling

memorandum.  All managers and superintendents was introduced to

the new system at the end of April 2018 and had discrepancies in their

productivity reports but was not reprimanded.   This conduct by

defendant T. Watkins shows fraud deception and conspiracy to

physically injury plaintiff in violation of 42 USC §1983.


PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court Grant to her judgment

containing the following relief:

a.      An award of damages to be determined by jury at the time

        of trial to compensate plaintiff for mental anguish,

        humiliation, embarrassment and emotional injury;

b.      An award of punitive damages, as against the defendant

        New York City Housing Authority, Carolyn Jasper, Cesar

        Gonzalez, Matthew Hoffman, Rodney Davis and Thelma

        Watkins;

c.      Such other and further relief as this Court may deem just

        and proper

August 30, 2018                         Respectfully Submitted

Gina Williams
Plaintiff-Pro Se
146-17 182nd Street
Springfield Gardens, NY 11413
Tel: (347) 886-7802

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Gina Williams
146-17 182 street
Springfield, NY 11413

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2018-02705 | Paul Young, Investigator | (212) 336-3783 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

MAR 27 2018

(Date Mailed)

Enclosures(s)

cc:    Attn
NYCHA Law Department
NEW YORK CITY HOUSING AUTHORITY
250 Broadway, 9th Floor
New York, NY 10007

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Gina Williams**
**146-17 182nd Street**
**Springfield Gardens, NY 11413**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2017-02301 | **Roxanne Zygmund, Investigator** | (212) 336-3764 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry*

FEB 23 2018

Enclosures(s)

**Kevin J. Berry,**
**District Director**

*(Date Mailed)*

cc: **Judith J. Jenkins, Esq.**
**NYCHA Law Department**
**NYC HOUSING AUTHORITY**
**250 Broadway, 9th Floor**
**New York, NY 10007**

# EXHIBIT   A



**NEW YORK CITY HOUSING AUTHORITY**
**LAW DEPARTMENT**
250 BROADWAY• NEW YORK, NY 10007

http://nyc.gov/nycha

**SHOLA OLATOYE**
CHAIR
**DAVID FARBER**
General Counsel

WRITER'S DIRECT LINE
(212) 776-5130

July 25, 2017

Sarina Shaver
Investigator
U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

Re:  Gina Williams v. New York City Housing Authority
     EEOC Charge Number: 520-2017-02301

Dear Ms. Shaver:

This position statement and the attached materials are submitted on behalf of the New York City Housing Authority ("NYCHA") in response to the above-referenced Charge of Discrimination ("Charge") filed by Gina Williams ("Williams") with the U.S. Equal Employment Opportunity Commission ("EEOC") on May 15, 2017.[1]

Williams, a Property Maintenance Supervisor ("PMS") at NYCHA's Pomonok Houses housing development ("Pomonok"), alleges NYCHA discriminated against her on the basis of her race (Black) and sex (female) and subjected her to retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*  Specifically, Williams alleges that she was transferred from NYCHA's Beach 41st Houses to Pomonok in retaliation for a lawsuit filed against NYCHA in July 2016 and a complaint in February 2017 regarding counseling memoranda she received in January 2017 and April 2017 [sic].  Williams states she is not given the same opportunity due to her race and gender but does not allege any adverse action taken due to her race or gender.

The Charge should be dismissed as time-barred.  Williams' discrimination claims predicated upon alleged conduct occurring prior to July 19, 2016 (that is more than 300 days prior to the filing of his Charge on May 15, 2017), are time-barred.  This includes her allegations

---

[1] Please be advised that this statement of position and supporting documentation (as well as any other information or documents submitted during the course of investigation) contain confidential information.  As such, they should not be disclosed or disseminated to any person without the prior written approval of the undersigned.  Respondent reserves the right to amend or modify this position statement at any time.

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 2

regarding her transfer to Pomonok which occurred in April 2016.

NYCHA denies it discriminated against Williams based upon her race or gender, or retaliated against her for engaging in protected activity. Williams cannot establish a *prima facie* case of race or gender discrimination. Her transfer does not constitute an adverse employment action and did not occur under circumstances giving rise to an inference of discrimination. Williams' title, compensation and duties did not change when she transferred from one NYCHA development to another within the Queens/Staten Island Property Management Department and Carolyn Jasper ("Jasper"), the Department Director who selected Williams for transfer, is also a Black woman. Even if Williams could establish a *prima facie* case, she cannot demonstrate that NYCHA's legitimate, non-discriminatory reason for her transfer – that she performed well at her prior development and Jasper wanted an experienced PMS to improve maintenance operations at Pomonok – is a pretext for discrimination.

To the extent the Charge may be viewed as alleging that any counseling memoranda or reprimand are discriminatory, those acts similarly are not adverse employment actions; did not occur under circumstances giving rise to inferences of race or gender discrimination; and were issued for legitimate reasons – including falsely representing to her superiors that a raw sewage leak had been abated -- which Williams cannot demonstrate are a pretext for discrimination.

Moreover, Williams cannot establish a *prima facie* case of retaliation because NYCHA has no knowledge of any 2016 lawsuit alleging violation of anti-discrimination laws or concerning her employment[2]; Williams' February 2017 letter to a union president does not constitute protected activity; no casual connection exists between the alleged protected activity and the acts complained of (with the complained of acts preceding the February 2017 letter). Even if Williams could establish a *prima facie* case, NYCHA can articulate a legitimate, non-retaliatory reason for the memoranda and reprimand, and Williams cannot demonstrate that retaliation was the but-for cause of any of the instances of alleged retaliation.

Accordingly, the allegations in the Charge are untimely and lack reasonable cause and should be dismissed in their entirety.

## NYCHA's Equal Employment Policy

NYCHA's Equal Employment Opportunity Policy prohibits discrimination in employment on the basis of, *inter alia*, race and gender and prohibits retaliation against an employee who files an internal or external complaint of discrimination under applicable anti-discrimination laws, provides information related to, or assists in, the investigation of complaints of discrimination and/or harassment, or voices opposition to unlawful discrimination. *See* NYCHA's Equal Employment Opportunity Policy Statement annexed as Exhibit A.

---

[2] NYCHA requests that the Commission provide the case name, docket number and court in which this action was allegedly filed.

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 3

## NYCHA's Human Resources Manual

The Human Resources Manual provides employees with information and guidelines pertaining to their employment at NYCHA. For example, in Section 30, "General Regulations of Behavior", NYCHA employees cannot "[f]ail, neglect or refuse to perform duties or complete assigned tasks". A copy of the relevant portions of the NYCHA Human Resources Manual is annexed as Exhibit B. The manual was updated to incorporate NYCHA's Personnel Rules and Regulations and General Regulations of Behavior. Every employee received the updated Human Resources Manual which was effective December 1, 2015 and updated December 2016. A copy of Williams' acknowledgement of receipt is also annexed as Exhibit B.

## Factual Background

### Employment History

In May 1991, Williams began her employment with NYCHA as a City Seasonal Aide. Williams was recommended for a full-time position and appointed as a Caretaker J on November 9, 1992. On November 20, 1995, Williams became a Heating Plant Technician and in June 2004, she was promoted to the position of Assistant Resident Buildings Superintendent. On May 5, 2013, Williams was promoted to the position of Resident Buildings Superintendent (Property Maintenance Supervisor) and assigned to the Beach 41st Street-Beach Channel Drive Houses.

Effective April 18, 2016, Williams was transferred to the Pomonok Houses. Jasper observed that Williams performed well at Beach 41st Houses and was always prepared at staff meetings. Jasper transferred Williams because Jasper needed an experienced PMS to help Pomonok improve and she thought Williams' experience and prior work performance were assets Pomonok needed. Prior to transferring a PMS, Jasper meets with the PMS and the corresponding Regional Asset Manager to discuss why the employee has been transferred to another location. During their meeting regarding Williams' transfer, Jasper informed Williams of the need to improve Pomonok's maintenance operations and staff morale. Pomonok's service level agreement (SLA) or response to service requests time was 14.39 days, more than double NYCHA's target SLA of 7 days. As Pomonok PMS, Williams' immediate supervisor is Matthew Hoffman, Regional Asset Manager, Queens/Staten Island Property Management.

As a PMS, Williams' responsibilities include, but are not limited to the supervision of the care, cleaning, and policing of all public spaces within the Housing Authority and grounds; maintenance of facility services (water, gas, electricity, heat, hot water and waste disposal); training and instruction of maintenance employees; response to requests for necessary repairs and adjustments to structures and equipment. *See* Resident Buildings Superintendent Job Specification, annexed as Exhibit C. Williams is also responsible for ensuring her staff meets goals set by NYCHA's Operations Division and prepares appropriate reports for Borough-wide data tracking. PMSs are responsible for managing the work orders in NYCHA's Maximo Work Order Tracking System. The PMS should monitor scheduled appointments, ensure staff is assigned and materials ordered in advance for repairs.

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 4

   In 2016, the Queens-Staten Island Property Management Department moved from a centralized property management approach to a model called NextGen Operations ("NGO"). The purpose of NGO is to empower Property Managers to set their own budgets and problem solve to improve performance in several key areas, one of which is operations or maintenance. Property managers and all staff at the developments including PMS received formal training through a curriculum developed by NYCHA which incorporates industry best practices and reviews pilot data with a focus on setting up the development for success. Within the past year, PMs and PMSs were required to attend two refresher courses entitled "Managing Public Housing" and "Supervision and Management". These courses reviewed and built upon skills already acquired by PMs and PMSs. PMSs are provided with an annual budget from which they create a spending plan to purchase needed janitorial and maintenance supplies and procure vendors as necessary. PMSs are also permitted to solicit contractors for repairs through NYCHA's procurement process. In addition, in August 2016 funds were given to all developments under NYCHA's "Get It Done" initiative to address aging repair orders and other development maintenance and beautification needs. Pomonok Houses received an allocation of $433,000 under this "Get It Done" initiative; Williams had spent less than 25% of the funds when reviewed in March 2017.

Staffing at Pomonok

   Pomonok Houses consists of 35 buildings containing 2,065 units in Flushing, Queens.

   The Property Manager, Xenia Rivera, supervises the management office staff. As PMS, Williams supervises the maintenance staff. Pomonok's current staffing under Williams includes two (2) Assistant Property Maintenance Supervisors, two (2) Supervisor of Housing Caretakers, two (2) Supervisors of Housing Grounds, nine (9) Maintenance Workers, and 29 Caretakers.

Disciplinary History

   In January 2017, Cesar Gonzalez ("Gonzalez"), Regional Asset Manager, Queens/Staten Island Property Management, issued Williams a counseling memorandum for failure to perform her duties. *See* Williams' counseling memoranda collectively annexed as Exhibit D. A Pomonok resident had complained that the entrance door lock was out of order for one month and one-half, the building was dirty, the elevator track dirt was affecting the operation of the elevator, there were feces throughout the building and the canopy lights were out of order. Williams informed Gonzalez that her staff had checked the buildings and they were not filthy as reported in the complaint. In addition, a review of work orders for Pomonok found that two work orders for the front door lock had been submitted in December 2016, one of which was already more than a one-month old. A review of data for Pomonok showed that the development's work order SLA was 15.82 while NYCHA's work order target SLA is 7 days and the turnaround time for vacant apartments at Pomonok was 49.4 days while NYCHA's target turnaround time is 20 days. The memo noted that Williams had had ample time to reduce the SLA and turnaround times, she had received training in using the MAXIMO work order system, and she must immediately improve the SLA and move-out time.

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 5

By letter dated February 8, 2017 to the President of Teamsters Local 237, and copied to NYCHA's Chair and others, Williams disagreed with the basis of the January 23rd and 30th counseling memoranda, and alleged the memoranda addressed the same conduct. She attributed the deficiencies at Pomonok to short-staffing and attached a news article regarding poor conditions at Pomonok pre-dating her arrival. *See* Letter dated February 8, 2017, annexed as Exhibit F. As the January 30, 2017 counseling memorandum discussed aging work orders and the service level rate, issues also addressed in the January 23rd memorandum, the January 30th memorandum was rescinded.

On March 20, 2017, Borough Director Carolyn Jasper, RAM Hoffman, and a Deputy Director inspected Pomonok and found that conditions which had been identified in prior visits still existed: recycling and dump sites in disarray, trash strewn about, buildings which were not well-maintained and dried urine on the floors.

On March 24, 2017, Jasper, RAM Cesar Gonzalez and RAM Matthew Hoffman visited Pomonok based upon conditions reported to them by the Deputy Director of NYCHA's Skilled Trades Division. Williams had reported to her superiors that the sewage leak had been treated and cleaned, but when they arrived they found it had not. There was raw sewage in the crawl spaces that had not been properly handled, which produced a foul odor. Hoffman reviewed the work orders for the building and found that four prior reports of the condition had been deemed unfounded.

Shortly after a media report of deplorable trash conditions on or about March 28, 2017, Jasper, then-Senior Vice President of NGO Janet Abrahams (a Black woman) and Hoffman visited Pomonok and found the conditions reported. They found a portion of the gate around the property was broken; that the gate segment was on the ground frozen in ice from a snow storm two weeks prior indicating that the gate had been broken for at least two weeks. They also found an abundance of trash strewn on the property and under the ice, contaminated recycling, and bulk debris next to a container.

On April 7, 2017, Hoffman met with Williams and her supervisory team and formulated a plan of action for addressing the conditions. On April 26, 2017, Hoffman issued Williams a counseling memorandum for failure to perform her duties. He recounted the conditions found at Pomonok during the visits and reminded Williams that she and her staff should be familiar with the Standard Operating Procedure for Maintenance and Janitorial Operations and that she must communicate with her staff and review maintenance priorities at the monthly staff meetings. *See* Exhibit D.

Local Hearing

On May 10, 2015, Hoffman served Williams with a Notice of Local Hearing. Williams was charged with incompetency and/or misconduct in that: (1) she failed to perform her duties on April 26, 2017, and (2) failed to perform her duties on January 23, 2017. On June 28, 2017, Williams appeared, with representation, for a Local Hearing based upon two charges. *See* Request for Local Hearing and Record of Local Hearing, collectively annexed as Exhibit E. The

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 6

neutral found Williams guilty of the first charge finding that despite complaints about the smell of raw sewage and garbage throughout the property, Williams did not inspect the grounds or take corrective action to fix these conditions and that she seemed to have no contact with her staff about problems at Pomonok. The neutral determined the penalty was to be a reprimand. The neutral dismissed the second charge due a discrepancy as to a date.

All PMSs in Queens/Staten Island Property Management are provided with the same resources: access to the NYCHA Scorecard, Operations/Performance Dash Boards, Budget Reports, Skill Trades/Planning Unit, the Maximo Work Order Tracking System and the Turnover Tracking Log. Furthermore, several PMSs at other developments in Queens (South Jamaica Houses, Queensbridge South Houses, Baisley Park Houses and Redfern Houses) also received counseling memoranda on January 23, 2017 or February 24, 2017 for unsatisfactory performance including: high SLA rates, aging mold and mildew work orders, unaddressed high priorities, etc. The other PMSs who received the counseling memoranda were male. All PMSs were given time to correct their development's poor performance and were provided with opportunities to review performance indicators and received instruction on the utilization of tools to enhance performance.

<u>Prior Litigation</u>

NYCHA does not have a record of a lawsuit filed in July 2016 by Williams. Williams' most recent lawsuit concerning her employment was filed in federal district court in February 2012.[3] Williams alleged race and gender discrimination and unlawful retaliation with respect to an incident with a subordinate, allocation of overtime and denial of promotion. The district court granted NYCHA's motion for summary judgment and dismissed the complaint. Among other things, the district court noted that Williams had previously declined an offer of a PMS position, and that Williams had worked more overtime than any other Assistant Superintendent during the relevant time period. *See* Memorandum Decision and Order in *Gina Williams v. NYCHA et al.*, 12-CV-0825, (E.D.N.Y. Feb. 12, 2012), annexed as Exhibit H.

**Response to Allegations**

Williams' allegations are without merit and should be dismissed as time-barred in part and in their entirety for lack of reasonable cause. Williams cannot establish a *prima facie* case of discrimination or retaliation. NYCHA did not discriminate against Williams because of her race or sex or retaliate against her by transferring her to Pomonok, or issuing counseling memoranda and a reprimand. Williams' claims as to her transfer are time-barred; in any event, Jasper transferred Williams to Pomonok because of her performance at another housing development and the need for an experienced PMS at Pomonok.

---

[3] At the time Williams filed this lawsuit in 2012, she was an Assistant PMS and Jasper was the Borough Director of Queens/Staten Island. In 2013, Williams was promoted to PMS and assigned to Beach 41st Houses.

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 7

## Discrimination

A *prima facie* claim of employment discrimination under Title VII of the Civil Rights Act of 1964, requires Williams to show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position she held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." *Ruiz v. County of Rockland,* 609 F.3d 486, 491-492 (2d Cir. 2010); *see* 42 U.S.C. §2000e *et seq.* Once a *prima facie* case has been shown, the burden shifts to the employer to articulate (not prove) some legitimate, nondiscriminatory reason for the challenged action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). Finally, the employee must then prove by a preponderance of the evidence that the employer's articulated reason is merely a pretext for discrimination. *Id.* Merely establishing that the employer's articulated reason is not credible will not satisfy the third step of this analytical framework. Rather, the employee must affirmatively demonstrate "both that the reason for the employment decision was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

Williams cannot establish a *prima facie* case for discrimination under Title VII because she cannot demonstrate that she suffered an adverse employment action or that the acts complained of occurred under circumstances giving rise to an inference of race or gender discrimination. Neither the transfer from one NYCHA development to another within the same department with the same title and compensation nor counseling or a reprimand constitutes a material adverse action. Nor do the circumstances of these acts give rise to an inference of race or gender discrimination. Carolyn Jasper – who, like Williams, is a Black woman – selected her for the Pomonok position because of her performance at Beach 41st Street and Pomonok's need for an experienced manager. She was counseled and reprimanded for failing to address deplorable conditions at Pomonok despite repeated notice of those conditions. Even if Williams was able to establish a *prima facie* case, NYCHA has articulated legitimate, non-discriminatory reasons for its actions which Williams cannot demonstrate are a pretext for race or gender discrimination.

## Retaliation

In order to establish a *prima facie* case for retaliation, an employee must demonstrate that: (1) she was engaged in a protected activity, (2) NYCHA was aware of her participation, (3) she suffered an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action taken by her employer. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000). The Supreme Court has held that "retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action"; this but-for standard is more demanding than the motivating-factor standard. *See Univ. of Texas Southwestern Medical Center v. Nassar,* 133 S. Ct. 2517 (2013). Claims of retaliation for engaging in protected activity under Title VII, are also examined under the McDonnell Douglas burden-shifting framework discussed above. *See Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir. 2013).

Gina Williams v. NYCHA
Charge No. 520-2017-02301
Page 8

A charging party may establish a causal connection between the protected activity and the allegedly discriminatory acts either "indirectly by showing that the protected activity was followed by discriminatory treatment … or directly through evidence of retaliatory animus. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (1993) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Courts in the Second Circuit recently have held that in order to establish a causal connection through temporal proximity, the adverse action must take place within two months of the protected activity. *See Williams v. Woodhull Med. & Mental Health Ctr.*, No. 10-CV-1429 (NGG)(LB), 2012 U.S. Dist. LEXIS 21645 (E.D.N.Y. Jan. 31, 2012).

Williams' claim of retaliation fails for several reasons, including that she did not engage in any prior protected activity, she has not suffered any adverse employment action, there is no causal connection between the complained of actions and the alleged protected activity, and the complained of actions were taken for legitimate, non-retaliatory reasons. NYCHA has no knowledge of any 2016 lawsuit concerning Williams' employment and her letter to her union's president does not constitute protected activity and is subsequent to her transfer and January counseling memoranda. Williams' 2012 lawsuit is protected activity but is too remote to create a causal connection through temporal proximity. Even if Williams could establish a *prima facie* case of retaliation, NYCHA can articulate legitimate, non-retaliatory reasons for her transfer, counseling and reprimand, and Williams cannot show that but for her 2012 lawsuit or her letter to her union's president that she would have not been transferred to Pomonok.

Accordingly, because Williams' race, gender or prior protected activity played no role in her transfer, counseling or reprimand, the Charge must be dismissed as time-barred in part and for lack of reasonable cause.

If you have any further questions or require additional information after reviewing this letter and the attached materials, please do not hesitate to contact me at (212) 776-5130 or judith.jenkins@nycha.nyc.gov.

Very truly yours,

*Judith J. Jenkins*

Judith J. Jenkins

# EXHIBIT   B

# Neglect pointed to at Pomonok Houses

Lack of maintenance, smaller staff affect the tenants' quality of life

Recommend 240   Share

Tweet

G+1   0

Share12

Posted: Thursday, August 21, 2014 10:30 am

by Laura A. Shepard, Chronicle Contributor

Flushing's Pomonok Housing was once considered the crown jewel of the NYC Housing Authority, but some tarnish has accrued over decades of neglect, mismanagement and budget cuts, according to tenants.

Monica Corbett, president of the Pomonok Residents Association, guided elected officials through the development last Thursday to show them the unkempt grounds, flooded parking lot, broken doors and overall lack of maintenance.

Corbett said the development was once a nice place to come home to, but at this point NYCHA is demanding more money from residents for very few services. She called on the agency to work with the residents to make Pomonok a better place to live.

State Sen. Toby Stavisky (D-Flushing), Assemblyman Michael Simanowitz (D-Flushing) and City Councilman Rory Lancman (D-Fresh Meadows) observed the conditions and spoke about the root causes and the need for NYCHA to address the issues.

"This is an ongoing problem," Stavisky said. "The Dumpsters are overflowing; there's debris on the street; we have a little lake over there in the parking lot. I'm sorry for the person whose car is partially underwater, but this shows the lack of personnel here at Pomonok to take care of these situations."

The submerged parking space in "Lake Pomonok" costs the tenant approximately $600 for the year.

Stavisky said there are only 12 caretakers for the entire complex, down from 45 about 10 years ago. NYCHA says there are 25. There used to be seasonal summer and winter workers, but they're gone.

Pomonok consists of 52 acres with 14 buildings and 2,171 apartments.

"If you only have a handful of people trying to maintain a property, it's not going to get maintained," Simanowitz said.

Rents range from $400 to $1,600, according to Corbett, and are determined by the number of occupants and their income.

She said that when people call to complain about knee-high grass, NYCHA tells them they cut grass every day, but Corbett says that is not true at Pomonok. She showed playgrounds where leaves from last fall still lie in the gutters and a tree limb that fell during Hurricane Sandy in 2012 remains.

Simanowitz added that the grounds are only part of the problem: inside the buildings, the lack of maintenance is more apparent.

"It's not unheard of for my office to get calls about puddles of urine in the elevators," Simanowitz said. "Now there are two parts to that. Number one, I would hope that the residents would care for their own buildings and not use their elevators as a bathroom, but even somebody who's inconsiderate enough to do that, the rest of the residents shouldn't have to wait days or weeks even before maintenance comes by with a mop to clean up."

Corbett showed a mailbox, where several of the doors are broken and the mail is not secure, adding that there is no security at Pomonok. While Stavisky's office allocated $700,000 for cameras, NYCHA estimates that putting them throughout the complex will require $14 million.

Corbett said that because there is no security, drug addicts regularly pop the locks to the trash compactor rooms to the point where some of them do not lock anymore. In some places, the buzzers do not work, so doors are propped open.

Though security is a major concern, Corbett said the complex is relatively safe, as it is situated in a middle-class community bounded by the LIE, Queens College and the Electchester complex. The last shooting was more than four years ago, drug busts occur occasionally and most crime is domestic.

Corbett said that when the compactors break, NYCHA is slow to fix them and merely puts garbage bags on door handles in the interim, which attract rodents. Some apartments are inundated with mold and mildew from leaky roofs and bathrooms without vents, while others have electrical issues.

While these issues are supposed to be addressed within 48 hours, NYCHA is often slow to deal with them, the president said.

Other complexes in other parts of the city have been completely revamped, but in three years Pomonok residents are supposed to get new windows for the first time in 35 years.

Corbett said that while NYCHA provides stoves and refrigerators, many of the appliances break and are replaced with "rehabbed" ones from other apartments, which often don't work well either.

She guided the officials to a playground full of children playing on rusted and corroded structures, the newest of which was installed in 1989.

"I think the housing authority has to acknowledge the fact that they are shortchanging the residents of Pomonok in terms of maintenance and care for this property and they need to do a little better job taking care of the grounds so the people of Pomonok have a place that they can be proud to call home," Corbett said.

Lancman attributed the issues to state and federal government cuts to NYCHA over the past few decades, coupled with its poor management.

One of the most pressing issues in the community is that NYCHA is trying to move some of the seniors with large apartments who have been there for decades into smaller ones, but many don't want to leave.

Stavisky said she is fed up with the agency. "Nearly every day my office gets a call from a Pomonok resident who is upset and frustrated by the deteriorating living conditions and NYCHA's extremely slow responses. Enough is enough. The residents deserve a complex that is clean, well-maintained and safe and I call on NYCHA to deliver that."

Both she and Simanowitz keep forwarding complaints to the agency. The tour was meant to draw attention to the issue and "hold NYCHA's feet to the fire," according to the senator.

NYCHA issued the following statement on the charges: "NYCHA is looking into the complaints and taking them seriously; staff on site ... is working hard to provide quality up-keep given resource constraints and the age and needs of the development."

Recommend 240  Share

Tweet

G+1  0

# Neglect pointed to at Pomonok Houses

**by Laura A. Shepard, Chronicle Contributor | Posted: Thursday, August 21, 2014 10:30 am**

Flushing's Pomonok Housing was once considered the crown jewel of the NYC Housing Authority, but some tarnish has accrued over decades of neglect, mismanagement and budget cuts, according to tenants.

Monica Corbett, president of the Pomonok Residents Association, guided elected officials through the development last Thursday to show them the unkempt grounds, flooded parking lot, broken doors and overall lack of maintenance.



### Neglect pointed to at Pomonok Houses 1

Monica Corbett, president of the Pomonok Residents Association, points to rusted and corroded playground equipment at the housing complex in Flushing. It was installed in 1989 and has not been maintained since then.

Corbett said the development was once a nice place to come home to, but at this point NYCHA is demanding more money from residents for very few services. She called on the agency to work with the residents to make Pomonok a better place to live.

State Sen. Toby Stavisky (D-Flushing), Assemblyman Michael Simanowitz (D-Flushing) and City Councilman Rory Lancman (D-Fresh Meadows) observed the conditions and spoke about the root causes and the need for NYCHA to address the issues.

"This is an ongoing problem," Stavisky said. "The Dumpsters are overflowing; there's debris on the street; we have a little lake over there in the parking lot. I'm sorry for the person whose car is partially underwater, but this shows the lack of personnel here at Pomonok to take care of these situations."

The submerged parking space in "Lake Pomonok" costs the tenant approximately $600 for the year.

Stavisky said there are only 12 caretakers for the entire complex, down from 45 about 10 years ago. NYCHA says there are 25. There used to be seasonal summer and winter workers, but they're gone.

Pomonok consists of 52 acres with 14 buildings and 2,171 apartments.

"If you only have a handful of people trying to maintain a property, it's not going to get maintained," Simanowitz said.

Rents range from $400 to $1,600, according to Corbett, and are determined by the number of occupants

"I think the housing authority has to acknowledge the fact that they are shortchanging the residents of Pomonok in terms of maintenance and care for this property and they need to do a little better job taking care of the grounds so the people of Pomonok have a place that they can be proud to call home," Corbett said.

Lancman attributed the issues to state and federal government cuts to NYCHA over the past few decades, coupled with its poor management.

One of the most pressing issues in the community is that NYCHA is trying to move some of the seniors with large apartments who have been there for decades into smaller ones, but many don't want to leave.

Stavisky said she is fed up with the agency. "Nearly every day my office gets a call from a Pomonok resident who is upset and frustrated by the deteriorating living conditions and NYCHA's extremely slow responses. Enough is enough. The residents deserve a complex that is clean, well-maintained and safe and I call on NYCHA to deliver that."

Both she and Simanowitz keep forwarding complaints to the agency. The tour was meant to draw attention to the issue and "hold NYCHA's feet to the fire," according to the senator.

NYCHA issued the following statement on the charges: "NYCHA is looking into the complaints and taking them seriously; staff on site ... is working hard to provide quality up-keep given resource constraints and the age and needs of the development."

# EXHIBIT   C



# New York City Housing Authority

## Queens / Staten Island Property Management Department
### 90-20 170th Street
### Jamaica, New York 11431
#### (718) 657-8300

**To:** Gina Williams, Property Maintenance Supervisor, Pomonok Houses, ID #8633

**From:** Cesar Gonzalez, Regional Asset Manager, Queens/Staten Island Management  *CG*

**Date:** January 23, 2017

**SUBJECT:** Counseling Memorandum Failure to perform Duties

On January 19, 2017 at 11:02AM the planning unit superintendent Mr. James Sanders sent an email to you and the Property Manager Ms. Xenia Rivera concerning a resident's complaints for the entrance door lock out of order for a month and a half, building being dirty, elevator track has dirt build-up affecting the operation of the elevator, feces throughout the building and canopy lights out of order (see attachments). You sent staff to check and replied that the supervisor of caretaker and the Assistant Superintendent Mr. Conry inspected the building and they found the building not to be in a filthy janitorial condition as stated. The building caretaker performed the morning schedule. The building needed to be mopped and the bulb on the seventh floor needs replacing and would be done in the afternoon schedule. You also indicated that maintenance has repaired the canopy lights.

I did a review of Maximo and found lobby door work order #47345983 "cylinderdm" remains open since December 12,2016 and work order #48391275 "doordml" as of December 29,2016. It is the Authority's policy to maintain a clean, safe, and secure environment for its residents, employees, and visitors. As such, a review of the data warehouse report for your development was conducted on January 19, 2017 and it revealed that the work order service level agreement for your development is at 15.82 days which is the highest in the borough and is unacceptable. The NYCHA service level agreement is 7 days. I reviewed your development scorecard indicators and your vacancy rate is at 0% (A), move out turnaround time is at 49.4 (F). You have been given instructions at prior borough and sector meetings that we must meet the 7 day goal and the turnaround time is 20 days. You have been given Maximo training by me and I have set up queries for you in Maximo. You have been given ample opportunity to reduce the service level agreement and turnaround time at your development.

As the Property Maintenance Supervisor it is your responsibility to oversee the day to day operations at your development. You must review the Maximo work order system daily and plan out the work that is needed to be addressed within the seven days and ensure all moveouts are done in a timely manner. You must also monitor your maintenance workers productivity (see attached). You are hereby instructed to show immediate improvement in this area.

CC: Jasper, Gonzalez, Davis, Employee File

The events recorded here and any repeated instances of the same or similar conduct may be subject to future disciplinary action.

I acknowledge receipt of this memorandum and understand a copy will be placed in my personnel folder.

*Employee Refuse to sign*

_____
Employee Signature

_____
Witnessed by

_____
Date

1/24/15
_____
Date

CC: Jasper, Gonzalez, Davis, Employee File

# EXHIBIT   D



**NEW YORK CITY HOUSING AUTHORITY**
POMONOK HOUSES • 67-10 Parsons Blvd., Flushing, NY  11365

TEL: (718) 591-4800 • FAX: (718) 591-6817

**SHOLA OLATOYE**
CHAIR & CHIEF EXECUTIVE OFFICER

TO: Gina Williams, ID#8633-Property Maintenance Supervisor
FROM: Xenia Rivera, Property Manager
DATE: January 30, 2017
SUBJECT: **COUNSELING MEMO:  Failure to Properly Monitor Work Orders**

On January 18, 2017 a review of the development work orders shows that there were 24 priority 7 work orders dating back to November 22, 2016. A review of the Data Warehouse report on January 19, 2017 revealed that the work order service level for Pomonok Houses is 15.82 and is unacceptable. The NYCHA service level agreement is 7 days. Moreover, a review of the Data Dashboard on January 27, 2017 reveals that there are 18 priority 7 emergency work orders open dating back to November 28, 2016. The priority 7 work orders must be addressed within 24 hours and if the emergency has been abated, the work order must be downgraded. There are 6 leak work orders open, oldest one is dated June 15, 2016; thirty nine maintenance past scheduled open work orders, oldest one dating back to May 17, 2016. If staff is unable to locate the original work order, you are required to reach out to the trade supervisor to close work order. There are 35 maintenance work orders that have been aging for more than 180 days and 59 maintenance work orders aging from 30 to 179 days.

You must abide within the guidelines of Standard Procedure 040:09:7 Managing Maintenance work orders.

As the Property Maintenance Supervisor, it is your responsibility to oversee maintenance day to day operations. You must ensure that you and the support staff is reviewing Maximo work orders daily and to effectively address, process, complete and close all work orders accordingly. You are hereby instructed to show immediate improvement in this area.

The events recorded here, and any repeated instances of the same or similar conduct may be the subject of a future disciplinary action.

_Refused to sign_                                    _1/30/17_
Employee Signature                        Date

_Tracy William Deputy Director_          _1/30/17_
Witness by                                      Date
Cc: C. Jasper; T. Williams; C. Gonzalez; R. Davis, File

# EXHIBIT   E

**GINA WILLIAMS**
**146-17 182nd Street**
**Spring field Gardens N.Y. 11413**
**Tel: (347) 886-7802**

RECEIVED
OFFICE OF THE CHAIR
N.Y.C.H.A.

2017 FEB -8  A 10: 49

February 8, 2017

Dear President Gregory Floyd:

I am a Residential Building Superintendent at Pomonok Houses for the New York City Housing Authority.  I am writing you for the following reasons:

1.    On January 23, 2017 I received a counseling memorandum for failure to perform duties.  I disagree with what is being stated.

2.    On January 30, 2017 I received another counseling memorandum for failure to monitor work orders.  Copies of the memorandums are enclosed.  Both counseling memorandums are charges for the same conduct.

3.    The New York City Housing Authority failed to provide me with the necessary staff such as a secretary to monitor work orders and I was without an Assistant Superintendent for seven months in 2016.  I was provided a new Assistant Superintendent October 4, 2016 who is still in training.  On January 30, 2017 the Deputy Director Tracey Williams asked me where is my third secretary whom is suppose to monitor the work orders. Pomonok Houses has been without the third secretary for over a year and originally had four. As you can see with the enclosed documentation the other large developments have the third secretary. Pomonok is the second largest development in Queens consisting of 2071 units, 35 buildings and 121 stairhalls

4.    I have brought to the attention of the Deputy Directors and Administrators several time informing them lack of staffing such as Caretakers, Supervision, maintenance, and lack of access to contractors.

5.    Upon my research I found a news articles dated August 21, 2014 where Pomonok Houses had the same conditions short staff of caretakers, neglectant of janitorial and maintenance service.  The Tenant Association President Monica Corbett and the State legislatures verified this.

6.    It appears these conditions were pre-existing prior to me being assigned to Pomonok Houses.  The New York City Housing Authority had failed to brief, appraise and provide me with adequate staffing, tools and equipment to address these conditions.

7.     I am a female Residential Superintendent in a male dominated title that have not been given the same Equal opportunity as the male Superintendents that operate large unit developments such as Ravenswood, Queens bridge North and Queensbridge South and Woodside.  In meetings my development Pomonok Houses is criticized, scrutinized and adversely spoken about.

I am respectfully requesting the above issues be investigated.

Respectfully

Gina Williams

C: Chairwoman Shola Oletoya
   State Senator Toby Stavisky
   Assembly man Michael Simanowitz,
   City Councilman Rory Lancman.

RECEIVED
OFFICE OF THE CHAIR
N.Y.C.H.A.
2017 FEB - 8 A 10: 49



**NEW YORK CITY HOUSING AUTHORITY**
90 CHURCH STREET • NEW YORK, NY 10007

TEL: (212) 306-3000 • http://nyc.gov/nycha

March 2, 2017

**SHOLA OLATOYE**
CHAIR & CHIEF EXECUTIVE OFFICER

Gina Williams
146-17 182nd Street
Springfield Gardens, NY 11413

Re: Office of the Chair Correspondence

Dear Ms. Williams:

This is in response to your letter dated February 8, 2017 to Gregory Floyd, President, Local 237 Teamsters with a copy to New York City Housing Authority Chair & Chief Executive Officer, Shola Olatoye. Your letter has been forwarded to the Senior Vice-President for Operations and the Director, Queens-Staten Island Property Management Department for review and investigation.

The New York City Housing Authority takes allegations of discrimination seriously. Therefore, your concerns have also been referred to the Equal Opportunity Department for investigation.

Sincerely,

Kenya Salaudeen
Director of Human Resources

KS: sm

# EXHIBIT   F



# New York City Housing Authority
## Queens / Staten Island Property Management Department
### 90-20 170th Street
### Jamaica, New York 11431
#### (718) 657-8300

**To:** Gina Williams, Property Maintenance Supervisor, Pomonok Houses, ID #8633

**From:** Matthew Hoffman, Regional Asset Manager, Queens/Staten Island Management

**Date:** April 26, 2017

**SUBJECT:** Counseling Memorandum Failure to perform Duties

On Friday, March 24, 2017 the Director Carolyn Jasper and Regional Asset Manager Cesar Gonzalez and I visited the property based on the conditions reported by Skill Trades Deputy Director Rodney Davis, in the building recently visited by the media regarding a smell in the building, that you reported via email (see attached) that it was cleared and sanitized on March 21, 2017 at 10:30am, We found that the crawl space was not been properly cleaned, sanitized and that there was still raw sewage present.

You were then given instructions to have the crawl space cleaned and sanitized by the contractor that cleared the stoppage. The contractor came to the property and cleaned and sanitized the crawl space. Pictures were taken of all deficiencies before and after they were addressed. Any basement with a stoppage must be reported to the Emergency Service Department according to procedure, cleaned, and sanitized. Upon the stoppage being cleaned, staff is required to notify ESD with an update. I have attached ADGM #2012-0011 on how to address House, stack and basement stoppages for guidance. I looked in the system and saw work orders for this building dating back 02/28/2017(WO# 49172065) claiming a stoppage and again on 3/17/2017(WO# 49762748), 03/19/2017(WO# 49771543),and on 03/20/2017 (WO# 49783844). All these work orders came back as unfounded. Media visited this building on 3/20/2017, and found contractors addressing the stoppage, the very same stoppage that maintenance had earlier stated were unfounded. It was quite evident that you and staff did not check the basement properly

The Media also visited your development again on March 28th responding to resident complaints of the trash conditions at your development. The media was able to gain access to your trash compound site and found the area to be in deplorable conditions. As a result of the media inquiry, the Senior Vice president for NGO operations visited your development along with the Director of Queens/ Staten Island Property Management and myself and we concurred with what was being reported. When you were asked why the gates were not locked and how media gained entrance to the site you responded that you found out that day that the gate was broken from your Supervisors of Grounds. When we inspected the area, it was quite obvious that the gate was broken for

quite some time. We found the broken gate on the ground under ice from a snow storm that happened two weeks prior. We also found garbage strewn all over the grounds over and under ice which led us to believe that the area has not been kept clean. We also found a pile of contaminated recycling that had not been thrown out we also found a pile of bulk debris strewn next to a 30 yard container. In addition to that the Director, Deputy Director of Skilled Trades, and myself inspected your development on 3/20 /2017 and found Conditions that still needed to be addressed from earlier visits that were made by the Director and Deputy Director on February 17, 2017, and they are as follows: The recycling and dump sites were in disarray with trash strewn everywhere, conditions such as this invite rodent activity. We also observed areas around the buildings that have not been policed in quite a while and visited several buildings, the first of which was the building that the chair visited, the Resident Association President's building and the model building. We observed that painting was going on in the public spaces buildings However from what I saw, if you do not keep up with the Janitorial Maintenance of that building it will easily fall back into disrepair. I also found dried urine on several floors and trash in several areas. Most of the public hallway floors still need to be mopped, stripped and waxed. With respect to the other buildings we visited, the same conditions were found. You are required to use every tool and resource available, provided by NYCHA, to improve and maintain standards of the Model building as well as janitorial conditions throughout the development as a whole.

On April 7th 2017, I met with you and your Property Management Supervisory team and formulated a solid reasonable Grounds and Janitorial Maintenance Plan.. . This plan of action has been created to ensure that all trash is picked up and that the dump sites are cleaned in a timely fashion; this Plan must be adhered to. Moreover, you and your Supervisory staff are required to familiarize your selves with the Standard Operating Procedure for Maintenance and Janitorial operations.

As a Property Maintenance Supervisor it is your responsibility to adhere to the following:
1. Oversee daily Maintenance and Janitorial operations at development.
2. Supervise the repair of structures and equipment, maintenance of roof tanks, standpipe systems, sprinkler systems and auxiliary equipment. Supervise the care of buildings and ground through labor and material resources.
3. Monitor inventory supply and arrange for replenishment as needed.
4. Conduct building inspections and follow-up on repairs for PHAS preparations.
5. Monitor work orders in Maximo and deployment of staff to address repairs.
6. Oversee repair work done by Maintenance Workers in residents' apartments and public spaces.
7. Supervise the preparation of move-outs.
8. Provide safe and clean housing for our residents.
9. Walk your Property daily.
10. Procure vendors as needed and check vendor's work ensuring that it is completed before payment.

Also as a leader, clear communication and planning with your supervisory staff are essential tools that will ensure the efficient and smooth operation of your development. These issues must also be communicated in your monthly meetings with staff. The events recorded here and any repeated instances of the same or similar conduct may be subject to future disciplinary action.

CC: Jasper. Gonzalez, Hoffman, Davis, Employee File

I acknowledge receipt of this memorandum and understand a copy will be placed in my personnel folder.

_Refused to Sign_
Employee Signature

4/26/2017
Date

_Cathy Lopez, Director_
Witnessed by

4/26/2017
Date

CC: Jasper, Gonzalez, Hoffman, Davis, Employee File

# EXHIBIT   G

NYCHA 015.061B (Rev. 5/04)
**RECORD OF LOCAL HEARING CONDUCTED BY NEUTRAL**

**NEW YORK CITY HOUSING AUTHORITY**

| NAME OF EMPLOYEE | TITLE | EMPLOYEE ID NO. |
|---|---|---|
| Gina Williams | Property Management Sp. | 8633 |

| DEPARTMENT | LOCATION/DIV | CASE ID # |
|---|---|---|
| Queens / Staten Island Boro | 90-20 170 St. Apt 11 Queens, Exp. 11 | 3004 |

## I. HEARING

**A.** A Local Disciplinary Hearing was held before me on:

Date 6-28-17 .  Hour _____  Place _____

☑ Employee was represented by *Norberto Luna*

☐ Employee was not represented

☑ Charges Presented By Gary Wyatt / Cesar Gonzalez , Title *Regional Asset Manager* .

Employee's Plea *(In entering plea, refer to Specification Number)*

☐ Guilty to Specification(s) _____

☐ Guilty with an Explanation to Specification(s) _____

☐ Not Guilty to Specification(s) _____

**B.** Brief Summary of Proceeding MANAGEMENT WITNESS TESTIFIED THAT COMPLAINT REGARDING THE SMELL OF RAW SEWAGE WAS NOT ADDRESSED BY MARCH 24, 2017, WHEN THEY VISITED THE BUILDING. RAW SEWAGE WAS STILL PRESENT, APPARENT FROM THE ODOR UPON INSPECTION. MS WILLIAMS TESTIFIED THAT SHE WAS RESPONSIBLE FOR OVERSEEING AND THE OVERALL OPERATION AT PamoNok - WHICH WOULD INCLUDE INSPECTIONS AND FOLLOW-UP ON REPAIRS. THIS PARTICULAR COMPLAINT STARTED IN FEB 28, 2017 - AND WAS NOT COMPLETELY ADDRESSED BY MARCH 24, 2017. HAD SHE INSPECTED OR FOLLOWED-UP ON THIS REOCCURRING REOCCURRING COMPLAINT SHE FAILED TO ⸻ . BOTH MANAGEMENT & UNION WITNESSES TESTIFIED THAT GARBAGE WAS OUTSIDE THE COMPOUND.

## II. NEUTRAL'S FINDINGS/DETERMINATION   UNION WITNESS TESTIFIED THAT IT WAS THE RECYCLING GARBAGE & WENT INSTRUCTED TO PLACE IT INSIDE THE COMPOUND

**A.** After careful consideration of all the testimony adduced at the hearing and after due deliberation, I have concluded that the Employee is: *(For each specification indicate Guilty or Not Guilty)*

1. _Guilty_  MANAGEMENT WITNESSES TESTIFIED THAT GARBAGE WAS OUTSIDE THE COMPOUND AND ALONG THE FENCE. WHERE IT SHOULD'VE BEEN.

2. DISMISSED - DATE Discrepancy .

3. _____   4. _____

I FIND THAT MS. WILLI DIDN'T INSPECT THE AREA AND TAKE CORRECTIVE ACTION. SHE SEEMS TO HAVE NO CONTACT WITH HER STAFF ABOUT WHAT WAS HAPPENING AT PamoNok .

If found Guilty, indicate the number of previous disciplinary actions.
_____ General Trial Hearings   _____ Local Trial Hearings   _____ Counselling Memoranda

| **First Local Limits** | **Second Local Limits** | **Third Local Limits** |
|---|---|---|
| 1. Formal Reprimand | 1. Formal Reprimand | 1. Formal Reprimand |
| 2. Fine up to $100 | 2. Fine up to $100 | 2. Fine up to $100 |
| 3. Suspension without pay for a period up to 6 days | 3. Suspension without pay for a period up to 10 days | 3. Suspension without pay for a period up to 12 days, plus a $100 fine |
| 4. Loss of accrued annual leave up to 6 days | 4. Loss of accrued annual leave up to 10 days | 4. Loss of accrued annual leave up to 12 days, plus a $100 fine |

**B.** I accordingly determine that the employee be:

☐ Acquitted

☑ Reprimanded   ☐ Suspended for _____ work days   ☐ Fined $ _____

☐ Charged with _____ days accrued annual leave

**THIS DECISION IS FINAL AND CANNOT BE APPEALED OR GRIEVED**

| NEUTRAL'S NAME | NEUTRAL'S SIGNATURE & DATE | DATE EMPLOYEE NOTIFIED OF DETERMINATION |
|---|---|---|
| FREDRIKA Wilson | *Fredrika Wilson* | 6/28/17 |

DISTRIBUTION: ORIGINAL & 5 COPIES • ORIGINAL to Employee • 1st COPY to Department Director • 2nd COPY to Human Resources / Records Control • 3rd COPY to Originator's File • 4th COPY to Union • 5th COPY to Advocate/Hearing Coordinator

# EXHIBIT   H



# New York City Housing Authority
## Queens / Staten Island Property Management Department
### 90-20 170th Street
### Jamaica, New York 11431
#### (718) 657-8300

To: Gina Williams, Property Maintenance Supervisor, Pomonok Houses, ID # 8633

From: Matthew Hoffman, Regional Asset Manager, Queens/Staten Island Management

Date:  December 19, 2017

SUBJECT: Counseling Memorandum Failure to Perform Duties

On Thursday November 30,2017, I attended a Mayoral Town Hall Meeting where the Mayor and the General Manager were given a brief overview of concerns and conditions at your development based on numbers and facts that were given by your development and sent to Josephine Bartlett Legislative Coordinator for the Office of Intergovernmental Relations via email on Tuesday November 28th, 2017. On that email, it indicated that there were only seven exterior lights out at your development three of which were repaired it also stated four others were to be repaired by December 6th (see attached). The Mayor spoke on this and it was immediately challenged by a resident of Pomonok Houses. According to the resident, there were parts of the development that were completely dark and that there were many lights out at the development. At that time, the Director for Queens /Staten island Management instructed the Regional Asset Manager Cesar Gonzalez and myself to leave the Town Hall Meeting and visit your development to inspect the lighting conditions so that we could provide the General Manager with the correct information.

Based on our preliminary inspection we found there were twenty-nine lights out of order. The next day you were given instructions to perform a complete inspection of all the exterior lights currently out at your development including your roof bulk head lights. Your total count was one hundred fifty-seven lights. When asked to provide records of any light inspections that were performed by your development the past several months, you could not provide any proof that any inspections took place. Your failure to make sure these inspections were done compromised the safety of the both the residents and employees of Pomonok Houses.

 You are hereby directed to adhere to Standard Procedure 040:09:2, ensuring that the Supervisor of Housing Grounds perform a weekly inspection of exterior lights, and record their findings on the Outdoor Lighting Spreadsheet. Also, as

C: Jasper, Gonzalez, Davis Records Control, Employee File

per a Queens/Staten Island Management Department, a copy of the outdoor lighting spreadsheet is to be forwarded to the attention of Ms. Adrienne White in the planning unit by the 5th day of each month.

You are reminded as the Property Maintenance Supervisor it is your overall responsibility oversee the day to day operations of your development. and follow procedures set forth by the New York City Housing Authority. You are to inspect grounds review and sign off on reports that you receive from staff, you are to ensure all work that is required be completed correctly and in a timely manner also keeping copies of the reports in your superintendent file.

The events recorded here and any repeated instances of the same or similar conduct may be the subject of future disciplinary actions.

I have read and received a copy of this memorandum and I understand a copy will be placed in my personnel folder.

_____          _____
I have received a copy of this memo                          Date

*refused to sign*

_____          12/22/17
Witness

C: Jasper, Gonzalez, Davis Records Control, Employee File



**NEW YORK CITY HOUSING AUTHORITY**
**POMONOK HOUSES**
**67-10 PARSONS BLVD.**
**QUEENS, NEW YORK 11365**
**PHONE 718-591-4800 FAX 718-591-**

To: Gina Williams, Property Maintenance Supervisor #8633
From: Thelma Lambert-Watkins, Property Manager
Subject: Counseling Memo: Misconduct/failure to perform/Failure to Supervise staff
Date: January 29, 2018

---

On of January 5, 2018, you were instructed to verify a complaint received about inoperable compactors by Director Ms. Carolyn Jasper for Building 22, 23, 24, & 28.   On the same day, you reported that all compactors were working. On the same day Deputy Director Rodney Davis, You and I, all went to inspect the same units that you reported were all working and the following was observed:

**Building # 22**
This building has four (4) compactors – All four (4) compactors are not functioning automatically (Photocell is not initiating movement of the ram, staff must operate the machine by pushing the button on the panel), therefore, the system requires manual operation, which is not supposed to be the first option. This means someone must always be on site for the system to operate and the system was not manufactured to operate in this manner.

**Building #23**
This building has five (5) compactors – One (1) compactor was operational, while on the other hand, two (2) are not functioning automatically (Photocell is not initiating movement of the ram, staff must operate the machine by pushing the button on the panel), therefore, the system requires manual operation, which is not supposed to be the first option. This means someone must always be on site for the system to operate and the system was not manufactured to operate in this manner.
The two (2) remaining compactors did not operate at all (would not work automatically or manually), which require staff to pull garbage or bag down the floors.

**Building #24**
This building has six (6) compactors – All six compactors are not functioning properly, three (3) are not functioning automatically (Photocell is not initiating movement of the ram, staff must operate the machine by pushing the button on the panel), therefore, the system requires manual operation, which is not supposed to be the first option. This means someone must always be on site for the system to operate and the system was not manufactured to operate in this manner. The
Three (3) remaining compactors did not operate at all (would not work automatically or manually), which require staff to pull garbage or bag down the floors.

**Building #28**
This building has four (4) compactors – two (2) are not functioning automatically (Photocell is not initiating movement of the ram, staff must operate the machine by pushing the button on the panel), therefore, the system requires manual operation, which is not supposed to be the first option. This means someone must always be on site for the system to operate and the system was not manufactured to operate in this manner.
The two (2) remaining compactors did not operate at all (would not work automatically or manually), which require staff to pull garbage or bag down the floors.

In closing, only one (1) out of nineteen compactors operated in accordance with manufacturers specification and expectation, moreover, the status of the compactors failed to meet NYCHA's expectation, and place undue hardship on development staff who are required to service the compactors and ineffectively handle garbage.  As we are fully aware, the bagging down of building is an unacceptable option, due to the potential for fires, and the need for a fire watch.

Upon review of work orders created for compactors for the month of January, it was confirmed that two work orders were created a full four days later, on Jan. 9th for the nineteen (19) O.O.O. compactors.

As the Property Maintenance Supervisor (PMS) of Pomonok Houses it is your responsibility to supervise and maintain all aspects of the maintenance, janitorial and grounds operation. It is also your responsibility to ensure that all major outages are reported and that work orders are created for the appropriate departments to have these outages remediated and repaired in a timely manner.

Ms. Williams, by not having these outages corrected in a timely manner you are in violation of N.Y.C.H.A. rules and regulations including, but not limited to, the following:

S.P. 060:67:1
II. DUTIES Section B. Reporting Conditions
Sub paragraph 2. Conditions That Need To Be Reported As Soon As Possible
• All defective equipment, compactor outages, stoppages, broken or defective lighting or locks and hardware glass breakage, damage to buildings, play or sitting areas, sidewalks, and surface or planted areas, or any unusual conditions.

HR Manual, Rule (B1) Employees of NYCHA shall *not*:
Fail to perform their duties in a satisfactory manner.

HR Manual, Rule (B2) Employees of NYCHA shall *not*:
Fail, neglect or refuse to perform duties or complete assigned tasks.

The events recorded here and any repeated instances of the same or similar conduct may be the subject of a future disciplinary action.

I have received a copy of this memo. Sign: *Refuse TO Sign*   Date: 1/29/18

Witness _____

CC: Jasper, Borough Director/Gonzalez, RAM/Records Control Division/Employee Personal folder



**NEW YORK CITY HOUSING AUTHORITY**
**POMONOK HOUSES**
**67-10 PARSON BLVD.**
**QUEENS, NY 11365**
**PHONE 718-591-4800 FAX 718-591-6817**

To: Gina Williams Property Maintenance Supervisor #8633
From: Thelma Lambert-Watkins, Property Manager
Subject:  Counseling Memo: Failure to Supervise
Date: May 7, 2018

On April 25, 2018, a review of the Productivity report of Pomonok maintenance workers revealed that as a maintenance unit we are woefully underperforming in several areas. It also shows the failure to supervise the Pomonok Houses Maintenance Department in the following, but not limited to, areas:

1) Work order productivity: Half (four) of our maintenance workers, are below the recommended average of 8 work orders per day.
2) Wrench Time: Three quarters (six) of our maintenance workers do not meet the target wrench time of 70%.
3) The percentage of tenant not home added to the percentage of unfounded equals 35.08 percent. Meaning that 35 percent of the time, our Maintenance staff is performing no work whatsoever.
4) Average start time of Maintenance: The average start time of our Maintenance staff is 9:00am. Maintenance staff should be in the field no later then 8:30am.

Ms. Williams, by failing to manage the productivity of our maintenance staff, you are not only failing to meet the goals set by N.Y.C.H.A., but you are doing a great disservice to the residents for which we work for.  In failing to perform your assigned duties, you are in violation of N.Y.C.H.A. rules and regulations including, but not limited to, the following:

S. P. 040:09:7
V. Duties and Responsibilities.
Section 2. Superintendent.

HR Manual, Rule (B1) Employees of NYCHA shall *not*:
Fail to perform their duties in a satisfactory manner.

HR Manual, Rule (B2) Employees of NYCHA shall *not*:
Fail, neglect or refuse to perform duties or complete assigned tasks.

The events recorded here, and any repeated instances of the same or similar conduct may be the  subject of a future disciplinary action.

I have received a copy of this memo. _Refused to Sign_      Date: _____

Witness _____ _Dan @ 5/7/18 @ 4:15pm_

CC: Rodney Davis, Borough Director, Miguel Molina, R.A.M., Records Control   Division, Employee Personal folder

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
GINA WILLIAMS,

               Plaintiff,                              Civ. No. 18 Cv 5912 (RJS)

     -against-

NEW YORK CITY HOUSING AUTHORITY,
CAROLYN JASPER, CESAR GONZALEZ,
MATTHEW HOFFMAN, RODNEY DAVIS
THELMA WATKINS
--------------------------------------------------X


Documents submitted to the Courts:

1. Consent Decree
2. Testimony from NYHA General Manager Vito Mustaciuolo April 24, 2018
   Hearing

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                                               :
UNITED STATES OF AMERICA,                                      :
                                                               :
                    Plaintiff,                                 :
                                                               :        18 Civ. 5213
            v.                                                 :
                                                               :
NEW YORK CITY HOUSING AUTHORITY,                               :
                                                               :
                    Defendant.                                 :
                                                               :
-------------------------------------------------------------- X

## **CONSENT DECREE**

TABLE OF CONTENTS

I.      RECITALS ................................................................................................. 1
II.     ADMISSIONS ........................................................................................... 1
III.    JURISDICTION AND VENUE .............................................................. 4
IV.     APPLICABILITY ..................................................................................... 4
V.      DEFINITIONS.......................................................................................... 4
VI.     MONITORSHIP ....................................................................................... 6
VII.    COOPERATION BY NYCHA ............................................................... 12
VIII.   HUD ASSISTANCE ................................................................................ 12
IX.     FUNDING AND RELATED PROVISIONS ......................................... 13
X.      INSTITUTIONAL CHANGES ............................................................. 15
XI.     RELIEF COMMENCING PRIOR TO EFFECTIVE DATE OR MONITOR ............ 16
XII.    MATTERS RESOLVED .......................................................................... 17
XIII.   FORCE MAJEURE ................................................................................. 18
XIV.    DISPUTE RESOLUTION AND COMPELLING PERFORMANCE ........................ 19
XV.     INFORMATION COLLECTION AND RETENTION ...................... 19
XVI.    COSTS ...................................................................................................... 20
XVII.   NOTICES.................................................................................................. 20
XVIII.  EFFECTIVE DATE ................................................................................. 21
XIX.    MODIFICATION .................................................................................... 21
XX.     TERMINATION ...................................................................................... 21
XXI.    SIGNATORIES/SERVICE ..................................................................... 22
XXII.   INTEGRATION ....................................................................................... 22
XXIII.  FINAL JUDGMENT ............................................................................... 22

## I.    RECITALS

1.        WHEREAS, plaintiff the United States of America commenced this action against the defendant New York City Housing Authority ("NYCHA") for appointment of a monitor and injunctive and other relief pursuant to the U.S. Housing Act of 1937 ("Housing Act"), 42 U.S.C. § 1437d(j)(3), the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4852d(b)(1), and the Toxic Substances Control Act, 15 U.S.C. § 2616(a)(1);

2.        WHEREAS, the United States alleges that NYCHA violated and continues to violate lead paint safety regulations promulgated by the U.S. Department of Housing and Urban Development and the U.S. Environmental Protection Agency, *see* 24 C.F.R. part 35; 40 C.F.R. part 745, as well as other HUD regulations, including those requiring public housing agencies to provide housing that is "decent, safe, sanitary and in good repair," 24 C.F.R. § 5.703;

3.        WHEREAS, the City of New York (the "City") agrees to the funding commitment in paragraphs 54 to 62 of this Consent Decree;

4.        WHEREAS, the Parties agree that settlement of this case is in the public interest and that entry of this Consent Decree is an appropriate means of resolving the claims asserted by the United States in its Complaint; and

5.        WHEREAS, the Court finds that this Consent Decree is fair, reasonable, and consistent with the public interest;

6.        NOW, THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## II.    ADMISSIONS

7.        NYCHA admits, acknowledges, and accepts responsibility for the following conduct:

### *Statements to HUD*

a.        At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA "will comply with" HUD's federal lead paint safety regulations.

b.        At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA was "in compliance with all applicable Federal statutory and regulatory requirements."

c.        Every year, since at least 2011 and through 2016, NYCHA submitted to HUD, via New York City's Consolidated Plans, untrue statements that "NYCHA complies with Federal, State, and City regulations concerning lead and executes HUD directives regarding lead-based paint (LBP)."

### *Lead Paint*

d.  In more than half of NYCHA's developments, NYCHA's inspections (including statistical sampling) have confirmed the presence of lead paint somewhere on the premises, and in at least 92 developments, the inspections (including statistical sampling) have confirmed the presence of lead paint inside apartment units.

e.  Since at least 2010, NYCHA has not performed most of the biennial lead paint risk assessment reevaluations required by regulation for developments containing lead paint. In a 2011 email, a NYCHA director advised a NYCHA executive that NYCHA was not conducting required risk assessment reevaluations.

f.  From at least 2012 to 2016, NYCHA failed to perform visual assessments of apartments for lead paint hazards as required by regulation. In 2016, NYCHA began performing visual assessments in units where children under six reside, but NYCHA has not yet performed visual assessments in the majority of apartments that may contain lead paint.

g.  Since at least 2010, NYCHA has not ensured that staff use lead-safe work practices when performing work on surfaces that may contain lead paint. NYCHA's policies and procedures do not ensure that maintenance workers are informed that the surfaces they work on contain lead paint. Less than one-third of the maintenance workers assigned to NYCHA developments with lead paint are trained in lead-safe work practices. In May 2016 email, a NYCHA executive advised that "there [were] only 33 paint[ers]/paint supervisors trained in lead safe practices" working in Brooklyn developments. NYCHA has determined that at least 12,000 apartments in Brooklyn developments may contain lead paint.

h.  From at least 2010 until 2015, NYCHA did not provide HUD with any information regarding children living at NYCHA who had been found to have an environmental intervention blood lead level ("EIBLL").

### *Mold Growth*

i.  Between 2011 and present, NYCHA residents have made many thousands of complaints about mold growth every year.

j.  In many cases, NYCHA staff verified that the mold growth covered 10 or more square feet. In nearly 300 cases between 2014 and 2016, the verified mold growth covered more than 100 square feet.

k.  Currently, after NYCHA has removed mold from apartments, the mold returns at least 30% of the time.

### *Adequate Heating*

l.  Residents called in roughly 825,000 complaints of insufficient heat between 2011 and 2016.

2

m.  In Winter 2017-2018 alone, more than 320,000 residents, 80% of the public housing population, lost heat.

*Functional Elevators*

n.  In 2016 alone, NYCHA experienced an average of more than 13 outages per elevator. The majority of NYCHA elevator buildings had at least one period with no functioning elevator service in 2016.

o.  Although NYCHA provides stair climbers to elderly or disabled residents in certain circumstances, NYCHA elevator outages can leave residents, including elderly and disabled residents, stranded in the lobby of their building.

*Pest Infestations*

p.  NYCHA's data reflects more than 260,000 work orders for roaches between 2013 and 2016. For the same period, there were more than 90,000 mouse work orders and nearly 36,000 rat work orders.

q.  The number of work orders created for roaches nearly doubled between 2013 and 2016, and the number of apartments reporting mice and rat complaints has been increasing since 2013.

*Backlog*

r.  From 2012 to 2013, NYCHA reported to HUD significant progress in reducing its backlog of work orders. During the same period, NYCHA suspended annual inspections, resulting in the creation of substantially fewer work orders. NYCHA reported its progress to HUD without mentioning its suspension of annual inspections.

*HUD Inspections*

s.  Every year, HUD assesses living conditions at NYCHA through Public Housing Assessment System ("PHAS") inspections.

t.  For a decade, NYCHA provided its staff with a list of "Quick Fix Tips" to improve inspection scores. These Quick Fix Tips included replacing damaged ceiling tiles with "painted cardboard," covering broken fences with 2x4s painted black, and placing "improperly stored flammables" "out of sight" on the day of an inspection.

u.  In one 2013 email, a NYCHA superintendent wrote to staff members, "We're hiding four big pails of oil behind your containers for our PHAS inspection today. We'll get them after it's over." The superintendent then forwarded his email to a NYCHA director, to request assistance in eventually disposing of the oil.

3

### III.   JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, 15 U.S.C. § 2616, 42 U.S.C. § 1437(d)(j)(3), and 42 U.S.C. § 4852d.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because the defendant resides in this district and because a substantial part of the events giving rise to the claims occurred in this district.  For purposes of this Consent Decree, or any action or proceeding to enforce this Consent Decree, NYCHA consents to venue in the Southern District of New York and to this Court's jurisdiction over this Consent Decree, over any such action or proceeding, and over NYCHA.

10.     For purposes of this Consent Decree, NYCHA does not contest that the Complaint states claims against NYCHA upon which relief may be granted.

### IV.   APPLICABILITY

11.     NYCHA shall provide a copy of this Consent Decree, or an appropriate summary, to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor or subcontractor retained to perform work required to comply with this Consent Decree, including Performance Requirements and Action Plans.

12.     In any action to enforce this Consent Decree, NYCHA shall not raise as a defense the failure by any of its officers, directors, employees, agents, contractors, or subcontractors to take any actions necessary to comply with this Consent Decree, including Performance Requirements and Action Plans, except to the extent permitted by Section XIII (Force Majeure) below.

### V.   DEFINITIONS

13.     Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "The Anti-Fraud Injunction Act" means the section of the United States Code set forth at 18 U.S.C. § 1345.

b.      "Action Plan" means one or more detailed plans for complying with a requirement stated in the Consent Decree, as further defined in paragraphs 27 through 36.

c.      "Board" means the board of NYCHA, including all of its members.

d.      "Chair" or "NYCHA Chair" means the chairperson of NYCHA.

e.      "Complaint" means the complaint filed by the United States in this action.

f.      "Consent Decree" means this consent decree.

g.     "EPA" means the U.S. Environmental Protection Agency.

h.     "Executive Order" means the Executive Order No. 180 issued on April 2, 2018, by the Governor of the State of New York, including any amendments thereto.

i.     "Housing Act" means the U.S. Housing Act of 1937, set forth at 42 U.S.C. § 1437d.

j.     "HUD" means the U.S. Department of Housing and Urban Development.

k.     "Lead Paint Free" means, for a residential property, that the property has been found not to have lead paint by a lead paint inspection conducted in accordance with 24 C.F.R. § 35.1320(a) (or that results of additional tests by a certified lead paint inspector refuted a prior finding that lead paint was present); or that all lead paint on the property has been identified and removed, and clearance has been achieved in accordance with 40 C.F.R. § 745.227(e) before September 15, 2000, or in accordance with 24 C.F.R. §§ 35.1320, 35.1325 and 35.1340 on or after September 15, 2000.  This term does not apply to residential property where enclosure or encapsulation has been used as a method of abatement.

l.     "Lead Paint Laws" means federal, state or local lead paint safety statutes and regulations, including but not limited to the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851; the Toxic Substances Control Act, 15 U.S.C. § 2616(a)(1); the Lead-Safe Housing Rule, 24 C.F.R. part 35; the Renovation, Repair, and Painting Rule, 40 C.F.R. part 745, subpart E; the Abatement Rule, 40 C.F.R. part 745, subpart L; and the Lead Disclosure Rule, 24 C.F.R. part 35, subpart A & 40 C.F.R. part 745, subpart F.

m.     "Monitor" means the individual appointed pursuant to paragraphs 15 and 16 of this Consent Decree.

n.     "NYCHA housing" means the apartment units, common areas, residential buildings, and building sites consisting of public housing owned or operated by NYCHA and receiving funding through Section 9 of the Housing Act.

o.     "Parties" means the United States, NYCHA and, with respect to its funding commitment in paragraph 54 of this Consent Decree, the City.

p.     "Performance Requirements" means objective quantitative benchmarks developed pursuant to the process set forth in paragraphs 23 to 25 of this Consent Decree.

q.     "PHAS Inspections" means HUD's Public Housing Assessment System inspections.  *See generally* 24 C.F.R. Part 902.

r.     "Quarter" means each three-month period ending March 31, June 30, September 30, and December 31 of each calendar year.

5

s.      "Quarterly Report" means the reports defined in paragraphs 41 to 43 of this Consent Decree.

t.      "TSCA" means the Toxic Substances Control Act, set forth at 15 U.S.C. § 2601 *et seq.*

## VI.    MONITORSHIP

### Purpose

14.     The purpose of the Monitorship shall be to ensure that NYCHA (1) complies with all Lead Paint Laws, (2) provides housing that is decent, safe, sanitary, and in good repair, in accordance with 24 C.F.R. § 5.703, (3) does not make false or misleading statements to the United States, and (4) implements the terms of the Consent Decree.

### Selection

15.     The United States shall propose a Monitor for approval by the Court. The Monitor shall be an individual chosen on the basis of merit. The United States will provide NYCHA and the City an opportunity to provide their views to the United States with respect to possible monitors. The United States in its discretion will also provide an opportunity for other stakeholders, including New York State, the New York City Council, and tenant groups, including the Citywide Council of Presidents, to provide views on selection of a Monitor. NYCHA and the City have the right to submit objections within 15 days of the United States' presentation of the monitor for approval by the Court.

16.     In the event that the person who is approved as Monitor resigns or otherwise ceases to serve as Monitor, the United States shall propose a new Monitor pursuant to paragraph 15 for approval by the Court.

17.     The Monitor shall engage such staff, expert consultants, or other third-party contractors as he or she deems appropriate to use his or her powers fully and perform his or her responsibilities fully.

### General Powers and Responsibilities

18.     The Monitor shall use his or her powers under this Consent Decree to ensure that the Monitorship's purposes are achieved and that NYCHA complies with, and on an ongoing basis will continue to comply with, these requirements:

a. NYCHA shall be in compliance with, and comply on an ongoing basis with, the requirements to (1) conduct visual assessments annually and at unit turn-over, 24 C.F.R. §§ 35.1120(c) and 35.1355(a)(2); (2) conduct biennial risk assessment reevaluations, 24 C.F.R. §§ 35.1120(c) and 35.1355(b)(4); (3) use lead-safe work practices, including training and certification, site preparation, containment, clean-up, and notification to residents, 24 C.F.R. §§ 35.1120(b) and (c), 35.1345, 35.1350, 35.1355(a)(4), and 40 C.F.R. part 745 subparts E and L; (4) follow elevated blood lead level response and notification requirements, 24 C.F.R. §§ 35.110, 35.1130; (5) make disclosures in accordance with the Lead Disclosure Rule, 24 C.F.R. part 35, subpart A and 40 C.F.R. part 745 subpart F; (6) review the adequacy of prior testing for lead paint and lead-free determinations by NYCHA; (7) comply in all respects with Lead Paint Laws; and (8) make NYCHA Housing fully Lead Paint Free within an accelerated timeframe (except as provided in paragraph 33 below).

b. NYCHA public housing shall be "free of mold," 24 C.F.R. § 5.703(f), and NYCHA shall remedy the conditions described in the Complaint related to mold and prevent recurrence of those conditions.

c. NYCHA shall provide heating that is "functionally adequate, operable, and in good repair," 24 C.F.R. § 5.703(c), including by complying with New York City Administrative Code § 27-2029a and 24 C.F.R. § 5.703(g), and shall remedy the conditions described in the Complaint related to heat and prevent recurrence of those conditions.

d. NYCHA shall provide elevators that are "functionally adequate, operable, and in good repair," 24 C.F.R. § 5.703(c), and shall remedy the conditions described in the Complaint related to elevators and prevent recurrence of those conditions.

e. NYCHA public housing shall be "free of infestations by rats, mice, or other vermin," 24 C.F.R. § 5.703(f); *see also* 24 C.F.R. § 5.703(a), and NYCHA shall remedy the conditions described in the Complaint related to pests and prevent recurrence of those conditions.

f. NYCHA shall attempt to avoid and promptly address any other health and safety issue that arises.

g. NYCHA shall ensure the integrity of PHAS and other inspections.

19.     The Monitor shall have full access to all information in NYCHA's possession, including but not limited to data systems, documents, and materials, and full access to all programs, services, facilities, and premises under the control of NYCHA.

20.     The Monitor may communicate with NYCHA officers, employees, contractors, managers or board members, without notice to NYCHA and without NYCHA's permission or presence, provided that such individuals shall not provide any information subject to the attorney-client privilege or attorney work product protection without NYCHA's consent.

NYCHA shall make any such individuals within its control available to the Monitor upon request.

21.     The Monitor will periodically (but at least twice annually) convene a Community Advisory Committee, consisting of NYCHA stakeholders such as NYCHA's Resident Advisory Board; resident, community, and employee representatives; senior NYCHA managers; and other relevant stakeholders to solicit input regarding the achievement of the Monitorship's purpose.  Such stakeholders may advise the Monitor regarding the prioritization of projects.

22.     The Monitor shall establish procedures for the Monitor to communicate with and solicit comment from residents and other NYCHA stakeholders outside of the Community Advisory Committee.

### Development and Implementation of Performance Requirements

23.     As soon as practicable after the Monitor's appointment, the Monitor shall develop Performance Requirements, in consultation with NYCHA and the City, to achieve compliance with the requirements of paragraphs 18(b) through (f).  The Monitor shall prioritize development of Performance Requirements that (in his or her judgment) are necessary to address emergent health and safety issues.  Proposed Performance Requirements shall be submitted to the United States for approval.

24.     Performance Requirements approved by the United States shall be filed by the Monitor on the Court's public docket.  A Performance Requirement shall be binding on NYCHA and enforceable by the Monitor or the United States beginning 30 days after its filing on the public docket, unless NYCHA has filed an objection with the Court.  If NYCHA timely files such objection, the Performance Requirement shall not go into effect until the Court resolves the objection.  On any such objection, the Performance Requirement shall be modified or set aside by the Court only if found to be arbitrary and capricious.

25.     If the United States disapproves the Monitor's proposed Performance Requirements, and the United States and the Monitor are unable to agree on a revision to the proposed Performance Requirements, the Monitor may ask the Court to approve the proposed Performance Requirements notwithstanding the United States' disapproval.  Within 30 days thereafter, the United States and NYCHA shall have an opportunity to submit any objections to, or arguments in support of, such Performance Requirements.  The Monitor's Performance Requirements shall be modified or set aside by the Court only if found to be arbitrary and capricious.  If not set aside, the Performance Requirement shall go into effect upon order of the Court resolving the objection.

26.     The Monitor, in consultation with NYCHA, may develop modifications to previously approved Performance Requirements.  Such proposed modified Performance Requirements are subject to the approval process and other terms described in paragraphs 23 to 25.

8

## Action Plans, Organizational Plan, and Operational Plan

27.    As soon as practicable after the Monitor's appointment, NYCHA and the Monitor collaboratively shall prepare one or more proposed Action Plans for the achievement of the requirements set forth in paragraph 18(a) and (g), and as soon as practical after each Performance Requirement goes into effect, NYCHA and the Monitor collaboratively shall prepare one or more proposed Action Plans for the achievement of each Performance Requirement and the requirements set forth in paragraph 18(b) through 18(f).  NYCHA and the Monitor shall consider public health and safety, cost, and other factors deemed relevant by the Monitor in developing Action Plans.  Each proposed Action Plan shall set forth specific actions necessary to bring NYCHA into sustained compliance with these requirements, shall require NYCHA to satisfy these requirements by a date certain, and shall include interim milestones with specific completion dates.

28.    As soon as practicable after the Monitor's appointment, NYCHA in consultation with the Monitor shall develop an operational plan ("Operational Plan") clearly delineating the roles, responsibilities, authorities, and reporting lines of NYCHA's Chair, General Manager, and Board, to enable NYCHA to expeditiously fulfill the purposes of the Consent Decree and submit such Operational Plan to the Monitor for review.  If NYCHA and the Monitor are unable to agree on an Operational Plan, then the Monitor shall develop his or her own Operational Plan pursuant to paragraph 31.

29.    As soon as practicable after the Monitor's appointment, NYCHA in consultation with the Monitor shall prepare a proposed plan ("Organizational Plan") for the implementation of changes to NYCHA's management, organizational, and workforce structure, including work rules, necessary or appropriate to achieve sustained compliance with the Performance Requirements and the requirements set forth in paragraph 18(a) through 18(g) and submit such Organizational Plan to the Monitor for review.  If NYCHA and the Monitor are unable to agree on an Organizational Plan, then the Monitor shall develop his or her own Organizational Plan pursuant to paragraph 31.

30.    Proposed Action Plans, the proposed Operational Plan, and the proposed Organizational Plan (collectively, "Plans") developed pursuant to paragraphs 27, 28, and 29 shall be submitted to the City for comment and to the United States for approval.  If approved by the United States, such Plans shall be filed on the Court's public docket, shall be binding on NYCHA as of the date of filing on the docket, and shall be enforceable by the Court upon application by the Monitor or the United States.

31.    If the Monitor and NYCHA are unable to agree on a Plan, or the United States does not approve a Plan submitted to it, the Monitor may instead develop his or her own Plan and submit it directly to the Court for approval.  Within 30 days thereafter, the United States and NYCHA shall have an opportunity to submit any objections to, or arguments in support of, such Plan.  The Monitor's Plan shall be modified or set aside by the Court only if found to be arbitrary and capricious.  If not set aside, the Plan will go into effect upon order of the Court resolving the objection.

32.     The Monitor and NYCHA together may develop a proposed modification to a Plan.  Such proposed modified Plan is subject to the approval process and other terms described in paragraphs 30 through 31, including the ability of the Monitor to submit his or her own modification to the Court in the absence of agreement.

33.     In an Action Plan addressing the requirements in paragraph 18(a), the Monitor may propose to modify paragraph 18(a)(8) to permit abatement of specific NYCHA developments by methods that are authorized by federal regulations other than removal, upon a finding by the Monitor that NYCHA will be able to comply with the ongoing maintenance and other obligations associated with using such alternate methods and that permitting such alternate measures will further the purposes of this Consent Decree.  Upon approval of such Action Plan pursuant to paragraphs 30 and 31, paragraph 18(a)(8) shall be deemed modified for purposes of this Consent Decree.

34.     An Action Plan may include, among other things, policies, procedures, systems, personnel and management structures to be adopted by NYCHA in order to come into compliance with, and maintain compliance with, federal law and NYCHA's obligations contained in paragraph 18 and otherwise as set forth in this Consent Decree.

35.     The Monitor shall not be responsible for NYCHA's day-to-day operations. Nothing in this paragraph is intended to limit the powers of the Monitor otherwise granted under this Consent Decree.

36.     In addition to any other powers of the Monitor under this Consent Decree, the Monitor may, pursuant to an Action Plan, direct NYCHA to select an independent contractor through an open and public bidding process, consistent with applicable law, which shall detail the scope of work and which shall make the selection based upon the contractor's experience, skill, expertise, and the estimated time and cost of repairs.  The Monitor shall give such direction when the Monitor believes it is important to achieve or sustain NYCHA's compliance with the Consent Decree.

37.     In addition to any other powers of the Monitor under this Consent Decree, if the purpose of the Consent Decree is being frustrated by the inability of NYCHA to comply with an Action Plan, the Monitor, with the consent of the United States, may apply to the Court seeking extraordinary relief, including the authority to enter into contracts on NYCHA's behalf.  The Monitor must present compelling evidence in support of his or her application.

**Executive Order and Court-Appointed Officers**

38.     Pursuant to the terms and conditions of the Executive Order, as it may be amended, $550 million in state resources may be available.  Both the Monitor and NYCHA may take advantage of procurement flexibility afforded by federal, state, and local law, including provisions of the Executive Order relating to rules of procurement and contracting and design/build authority consistent with applicable federal law.  The Parties agree that receipt of the $550 million in emergency state resources and the procurement flexibility afforded by provisions of the Executive Order relating to rules of procurement and contracting and design/build authority are important to the success of this Consent Decree.

39.     The Monitor shall coordinate with any other court-appointed officers addressing matters covered by this Consent Decree, including the Special Master appointed in *Baez v. NYCHA*, No. 13 Civ. 8915, as well as any relevant federal, state or local agencies or inspectors. In the event that the action or failure to take action of another court-appointed officer interferes with achieving the purposes of this Consent Decree, the Monitor, with the consent of the United States, may seek relief from the Court.

**Judicial Supervision**

40.     The Monitor, as an officer of the Court, shall be supervised by the Court.

**Reporting**

41.     The Monitor shall submit a Quarterly Report, beginning after the first full quarter after the date of appointment, to the United States, NYCHA's Chair and Board, and the Court, on the Court's public docket, setting out:

a.      The work performed by the Monitor during the relevant period;

b.      Objective data showing NYCHA's progress toward achievement of established Performance Requirements and other requirements of Action Plans, including interim milestones;

c.      The extent to which NYCHA is complying with the Consent Decree and any approved Performance Requirements and Action Plans; and

d.      Any other information the Monitor may deem appropriate to include in light of the Monitorship's purpose.

42.     The Monitor will provide draft Quarterly Reports to the Parties at least 15 business days in advance of issuance.  The Parties shall provide any comments on the report within 10 business days of receiving the draft report.  The Monitor shall consider the Parties' comments and may make changes before issuing the report.

43.     The Quarterly Report issued five years from the Effective Date, and each Quarterly Report thereafter, shall include an assessment of whether NYCHA meets the requirements for termination of this Consent Decree, as described in paragraph 97.

44.     After two years after the Effective Date, the Monitor may propose reducing the frequency of Quarterly Reports to semi-annual.  The reports shall continue to set out the information required for Quarterly Reports under paragraphs 41 and 43.  If any Party objects to the Monitor's proposal, the dispute may be submitted to the Court pursuant to paragraphs 84 to 86.

45.     The Monitor may communicate at his or her discretion and *ex parte* with any Party, the Court, the public, and representatives of any federal, state, or local government entity.

**Removal of Monitor**

46.     A Monitor may be removed by the Court for cause.

## VII.     COOPERATION BY NYCHA

47.     NYCHA shall cooperate in all respects with actions taken by the Monitor under this Consent Decree.

## VIII.     HUD ASSISTANCE

48.     The Monitor shall assist NYCHA in seeking such regulatory relief from HUD as he or she deems is necessary for NYCHA to comply expeditiously and in a cost-effective manner with its obligations under the Consent Decree.  Such regulatory relief may include:

   a.     The use of a procurement process for capital improvement projects where any such contract is awarded in a manner consistent with the best value two-step procurement process set forth in Part LLL of c. XXX of the New York Laws of 2018;

   b.     An increase in the micro-threshold for all contracts to $25,000;

   c.     An increase in the small purchase procurement threshold to $250,000; and

   d.     Contracts for the same scope of services (where the aggregate of such contracts exceeds the small purchase procurement threshold) to be procured separately by the small purchase procurement method by borough and/or development(s) rather than NYCHA-wide, where justified by need and approved by the Monitor;

49.     HUD shall consider any requests under paragraph 48 in accordance with all applicable legal requirements and principles of administrative procedure.  Nothing in this Consent Decree limits HUD's discretion in considering such requests.

50.     HUD hereby lifts the "zero threshold" for all of NYCHA's Capital Program drawdowns that was imposed on NYCHA on or about March 16, 2018, as an administrative sanction.

51.     The Monitor and NYCHA shall meet with HUD to discuss strategies to improve NYCHA's ability to comply with its obligations under this Consent Decree.

52.     HUD agrees to continue providing public housing operating and capital funds to NYCHA in accordance with its rules and regulations, including the funding formulas for operating and capital funds.  In accordance with these rules, regulations and formulas, HUD will not offset or reduce the formula grants by the amount of the funds the City is providing to NYCHA pursuant to this Consent Decree.

## IX.    FUNDING AND RELATED PROVISIONS

53.    NYCHA shall pay all reasonable fees and costs of the Monitor and the Monitorship necessary or appropriate to successfully conduct the Monitor's responsibilities under this Consent Decree.

54.    To assist NYCHA in its compliance with this Consent Decree, including NYCHA's obligations under Performance Requirements and Plans, the City agrees to provide financial support to NYCHA for the duration of the Consent Decree, as follows:

    a.    to provide the capital funding to NYCHA through Fiscal Year ("FY") 2027 reflected in Exhibit A under the heading "Capital Items," including allocations that flow to NYCHA developments through the Department of Housing Preservation and Development.  NYCHA and the Monitor shall have maximum flexibility as provided by law with respect to the projects for which these funds are utilized.  Nothing in this paragraph shall be construed as authorizing the shifting of funds from a particular initiative or project to another initiative or project;

    b.    to provide the annual operating funds to NYCHA through FY 2027 reflected in Exhibit A under the heading "Expense Items."  NYCHA and the Monitor shall have maximum flexibility as provided by law with respect to the projects for which these funds are utilized.  Nothing in this paragraph shall be construed as authorizing the shifting of funds from a particular initiative or project to another initiative or project;

    c.    to maintain the current practice of not seeking payments from NYCHA for payments in lieu of taxes ("PILOTS") and police services, and to not impose new or increased payment requirements or fees on NYCHA in any other areas except for payments such as water fees imposed uniformly on New York City landlords;

    d.    in addition to the funding in subparagraphs (a) and (b) above, to provide a total of $1 billion in capital funding over the four fiscal years following the Effective Date of this Consent Decree; and

    e.    to provide each fiscal year after the first four fiscal years following the Effective Date of this Consent Decree, an additional $200 million in capital funding to NYCHA in addition to the funding in subparagraphs (a) and (b) above.

55.    The City's funding obligations under paragraph 54 shall not be reduced by any funding provided by any other sources (including Borough President or City Council funds).  The City shall not setoff its obligation to pay funds under paragraph 54 against any funds that may now or in the future be due from NYCHA to the City, nor shall it exercise any right of recoupment related thereto.

56.    Subject to the following paragraph 57, the capital funding pursuant to subparagraphs (d) and (e) of paragraph 54 shall be provided by the City to NYCHA as follows: the Monitor (or NYCHA at the Monitor's direction) will submit a project description and scope

Case 1:18-cv-05912-JGK   Document 10   Filed 08/30/18   Page 63 of 86
Case 1:18-cv-05213   Document 5-1   Filed 06/11/18   Page 16 of 29

of work to the City's Office of Management and Budget ("OMB"). OMB shall approve this submission if the funds requested are within the dollar amounts described in subparagraphs (d) and (e) of paragraph 54. Subsequent to approval, NYCHA will submit the corresponding contracts to the City Comptroller for registration to the extent required by law. After the Comptroller registers a contract, NYCHA can pay vendors using its own funds. NYCHA will be reimbursed by the City through the Department of Housing Preservation and Development within 30 days of receiving a proper payment requisition and substantiating evidence of payment.

57.     In the event that the total amount of capital funds provided by the City pursuant to subparagraphs (a), (d), and (e) of paragraph 54 have not been paid by the City to NYCHA during the time periods described in those subparagraphs, the unpaid amounts will be carried over and added to the funds available to NYCHA in the immediately following fiscal year and, to the extent unspent in the next fiscal year,  shall continue to be carried over and added to each subsequent fiscal year until spent.

58.     Neither the Monitor nor NYCHA shall use City capital funds for non-capital projects.

59.     All funds described in subsections (d) and (e) of paragraph 54 shall be spent only pursuant to an approved Action Plan to meet NYCHA's obligations under the Consent Decree, and work paid for by such funds shall be performed under the direction of the Chair and General Manager subject to the terms of this Consent Decree.

60.     Nothing in this Consent Decree precludes the City, at its exclusive option or as otherwise provided by law, from authorizing additional expense or capital funding for NYCHA.

61.     In the event that an undue financial hardship results in the City's financial inability to pay the full amount requested pursuant to paragraph 54, the City shall submit to the Monitor, the United States, and NYCHA within 45 days of the Monitor's request a certification signed by the Mayor of the City and the City Comptroller setting forth that the City is unable to pay the entire amount requested, providing in detail the amount the City has the financial ability to pay ("Available Amount") a description of the causes and extent of the undue financial hardship and an explanation as to how the Available Amount was determined. The certification shall include a date when the City will be able to make more or all the funds due available. If the City is unable to provide such a date in the certification, the City shall provide a certification every 90 days until it is able to provide a date ("Future Availability Date") by which it will make more or all of the remaining funds available (collectively, the "Unpaid Amount"). The City will pay the Available Amount as provided in paragraph 54. If the Parties agree that there exists undue financial hardship on the part of the City, then NYCHA or the Monitor may seek a modification of applicable Action Plans pursuant to paragraph 32.

62.     The Monitor, the United States, and NYCHA may object to the City's certification, in which case the Court will decide whether, because of undue financial hardship, the City is financially unable to provide the funding as required by this Consent Decree. If the Court finds that the undue financial hardship did not occur, or that the City has the financial ability to pay some or all of the funding owed under this Consent Decree, the Court shall enter an

appropriate order requiring payment.  If no objection is filed to the certification, or if the Court rejects any objection that is filed, the City shall make the Unpaid Amount available for payment to NYCHA pursuant to paragraph 54 on before the Future Availability Date.  If the Court finds undue financial hardship, the Monitor and/or NYCHA may apply to the Court for modification of applicable Action Plans pursuant to paragraph 32.

## X.    INSTITUTIONAL CHANGES

63.    In consultation with the Monitor, NYCHA will create a Compliance Department headed by a Chief Compliance Officer.  The Chief Compliance Officer shall be responsible for:

a.    Overseeing NYCHA's regulatory compliance with regard to federal, state, and local obligations.

b.    Ensuring the accuracy of external reporting and statements by NYCHA.

c.    Ensuring that NYCHA management and staff receive appropriate compliance training.

d.    Maintaining a forum for employee, contractor, and resident complaints (including anonymous complaints) regarding compliance issues, and taking action on such complaints as appropriate.

e.    Ensuring the integrity of PHAS or other inspections at NYCHA.

f.    Advising the Environmental Health and Safety Officer (created pursuant to paragraph 64 below) of any information obtained by the Compliance Department that relates to environmental health and safety issues.

g.    Coordinating with the Environmental Health and Safety Officer regarding issues that impact both compliance and environmental health and safety.

h.    Reporting to the Monitor regarding any compliance issues identified during the term of the Consent Decree.

64.    In consultation with the Monitor, NYCHA will create an Environmental Health and Safety Department headed by an Environmental Health and Safety Officer.  The Environmental Health and Safety Officer shall be responsible for:

a.    Analyzing, overseeing, and improving environmental health and safety at NYCHA, which shall include but not be limited to issues relating to lead-based paint, mold, heating, pests, elevators, air quality, and other aspects of NYCHA's physical environment that affect residents' health or safety.

b.    Reporting to NYCHA's senior management and Board on environmental health and safety issues.

    c.      Making recommendations to NYCHA's senior management and Board for improvement and correction of any environmental health and safety issues at NYCHA.

    d.      Communicating with the public and stakeholders regarding environmental health and safety issues, including by maintaining a forum for employee and resident complaints (including anonymous complaints) regarding environmental health and safety issues.

    e.      Advising the Chief Compliance Officer of any information obtained by the Environmental Health and Safety Department that relates to regulatory compliance.

    f.      Coordinating with the Chief Compliance Officer regarding issues that impact both compliance and environmental health and safety.

    g.      Ensuring the proper application of lead paint interim controls and proper abatement of lead paint.

65.      In consultation with the Monitor, NYCHA shall create a Quality Assurance Unit charged with verifying the completion, timeliness, and quality of maintenance work.

## XI.    RELIEF COMMENCING PRIOR TO EFFECTIVE DATE OR MONITOR

66.      Without waiting for the occurrence of the Effective Date of this Consent Decree, the appointment of the Monitor, or the issuance of an Action Plan, NYCHA shall take the actions set forth in paragraphs 67 to 70 below.

67.      *Lead-Safe Work Practices and Abatement Rule* – Without waiting for the Effective Date, NYCHA shall comply in all respects with the lead-safe work practices (including training and certification, site preparation, containment, and clean-up, and notification requirements) required by 24 C.F.R. §§ 35.1120, 35.1130, 35.1345, 35.1350, 35.1355(a)(4), and 40 C.F.R. part 745, subpart E, and with the Abatement Rule, 40 C.F.R. part 745, subpart L.

68.      *Resident Notification* – No later than 150 days after its execution of the Consent Decree, without waiting for the Effective Date, NYCHA shall notify residents in any apartment that NYCHA has identified as containing lead paint, or in any apartment in a building with common areas that NYCHA has identified as containing lead paint, of this fact, together with (a) the location of the lead paint, (b) that NYCHA has the obligation to perform interim controls, (c) a description of how to voluntarily disclose to NYCHA that a child under six resides or is expected to reside in the apartment, and (d) a request to residents to report deteriorated lead paint or failure of encapsulation or enclosure, as provided in 24 C.F.R. §§ 35.1120(c) and 35.1355(a)(7), to NYCHA and the Monitor, except that NYCHA shall provide such notification to residents in any apartment in which a child under the age of 6 resides that NYCHA has identified as containing lead paint within 90 days of execution of the Consent Decree, without waiting for the Effective Date.

69.     *Lead Disclosure Rule* – No later than 120 days after its execution of the Consent Decree, without waiting for the Effective Date, NYCHA shall ensure that physical copies of all materials required to be disclosed by the Lead Disclosure Rule be present, available for inspection, and permanently maintained at the management office for each development.  No later than 180 days after its execution of the Consent Decree, without waiting for the Effective Date, NYCHA shall ensure that that paper or electronic copies shall be sent to each resident, that electronic copies shall be available to residents through an internet-based portal, and that electronic copies shall be available to the United States.

70.     *Prioritization* – In responding to reports of deteriorated paint, NYCHA shall prioritize the elimination of lead paint hazards in apartments in which children under six or pregnant women reside and common areas frequented by children under six.

## XII.    MATTERS RESOLVED

71.     This Consent Decree resolves the civil  claims of the United States asserted against NYCHA in the Complaint.  As to claims by the United States other than those asserted on behalf of EPA, subject to the terms of this Consent Decree, the United States releases the civil claims asserted against NYCHA in the Complaint.  As to claims asserted by the United States on behalf of EPA, subject to the terms of this Consent Decree, the United States on behalf of EPA covenants not to file a civil action against NYCHA asserting the claims asserted by the United States on behalf of EPA in the Complaint.

72.     The United States Attorney's Office for the Southern District of New York ("SDNY") agrees not to seek criminal charges against NYCHA based on the facts and omissions described in the Complaint through the Effective Date.  This Consent Decree does not limit in any way SDNY's prerogative to criminally investigate and/or criminally charge and prosecute any individual.

73.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.

74.     The United States reserves the right to seek further injunctive or equitable relief under its Complaint to supplement this Consent Decree if the Monitorship fails to achieve its purposes.

75.     Except as to the claims described in paragraphs 71 and 72, this Consent Decree shall not be construed to limit the rights of the United States to seek relief under the Housing Act, Anti-Fraud Injunction Act, TSCA, or under other federal laws or regulations.  The United States further reserves all legal and equitable remedies to address any potential imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, NYCHA's conduct, whether related to the claims described in paragraphs 71 and 72 or otherwise.

76.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief against NYCHA, NYCHA shall not assert, and may not maintain, any defense or claim based upon the principles of waiver,

res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in this case, except with respect to claims that have been specifically resolved pursuant to paragraphs 71 and 72.

77.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  NYCHA is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits, and NYCHA's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that NYCHA's compliance with any aspect of this Consent Decree will result in compliance with any provisions of federal, state, or local laws, regulations, or permits.

78.    This Consent Decree does not limit or affect the rights of the United States against any third parties not party to this Consent Decree (including any present or former employees, officers, or board members), nor does it limit the rights of third parties, not party to this Consent Decree, against NYCHA, except as otherwise provided by law.

79.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, anyone not a Party to this Consent Decree.

80.    Subject to paragraphs 71 and 72, HUD and EPA reserve all of their rights under applicable law.

81.    HUD specifically reserves the right to appoint, or to seek judicial appointment of, a receiver for substantial default, as well as all other administrative remedies.

## XIII.    FORCE MAJEURE

82.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of NYCHA that delays or prevents the performance of any obligation under this Consent Decree despite NYCHA's best efforts to fulfill the obligation. The requirement that NYCHA exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include NYCHA's financial inability to perform any obligation under this Consent Decree.

83.    If the United States agrees, or the Court determines, that a delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended for such time as is necessary to complete those obligations in light of the Force Majeure event.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.

## XIV.    DISPUTE RESOLUTION AND COMPELLING PERFORMANCE

84.      The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree, entering orders modifying this Consent Decree, or effectuating or enforcing compliance with the terms of this Decree.

85.      Should any dispute about the implementation of this Consent Decree arise, the Parties and the Monitor will endeavor in good faith to resolve it.  If they cannot do so, they shall raise the dispute with this Court, which shall resolve it.

86.      Except as otherwise provided in this Consent Decree, in any dispute before the Court NYCHA shall bear the burden of demonstrating that its position is consistent with the obligations and objectives of the Consent Decree and that accepting its position would better further the objectives of the Consent Decree than accepting any opposing position.

## XV.    INFORMATION COLLECTION AND RETENTION

87.      The United States and its representatives, including attorneys, contractors, and consultants, will have continued access to NYCHA data and personnel to the extent necessary (in the United States' unreviewable discretion) for oversight of implementation of the Consent Decree.

88.      Until one year after the termination of this Consent Decree, NYCHA shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) that relate in any manner to NYCHA's performance of its obligations under this Consent Decree.

89.      At the conclusion of the information-retention period provided in the preceding paragraph, NYCHA shall notify the United States at least 90 days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding paragraph and, upon request by the United States, NYCHA shall deliver any such documents, records, or other information to the United States.

90.      This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States (including HUD and EPA) pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of NYCHA to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

91.      NYCHA agrees that the United States may retain and use documents and information produced to it by NYCHA pursuant to Civil Investigative Demand or otherwise in the course of the United States' investigation of this matter, and in particular waives any limitation on the retention or use of such documents and information contained in 28 U.S.C. § 3733.

## XVI.    COSTS

92.    The Parties shall bear their own costs of this action, including attorneys' fees.

## XVII.    NOTICES

93.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:    robert.yalen@usdoj.gov
monica.folch@usdoj.gov
jacob.lillywhite@usdoj.gov
talia.kraemer@usdoj.gov
sharanya.mohan@usdoj.gov
dane.m.narode@hud.gov
ellis.demian@epa.gov (lead paint issues only)

As to the United States by mail:    Robert Yalen, AUSA
U.S. Attorney's Office
86 Chambers St., 3rd Floor
New York, NY 10007

Dane Narode
U.S. Department of HUD
Office of General Counsel
1250 Maryland, Ave, SW, Suite 200
Washington, DC 20024

Lead Paint Team Leader
US EPA Region 2
2890 Woodbridge Ave. (MS 225)
Edison, NJ 08837-3679
(lead paint issues only)

As to NYCHA by mail:        Stanley Brezenoff
                            Interim Chair and Chief Executive Officer
                            New York City Housing Authority
                            250 Broadway
                            New York, NY 10007

                            Debo P. Adegbile
                            Wilmer Cutler Pickering Hale & Dorr LLP
                            7 World Trade Center
                            New York, NY 10007

As to NYCHA by email:       stanley.brezenoff@nycha.nyc.gov
                            debo.adegbile@wilmerhale.com

As to the City:             Zachary W. Carter
                            Corporation Counsel
                            New York City Law Department
                            100 Church Street
                            New York, NY 10007

As to the City by email:    zcarter@law.nyc.gov

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

## XVIII.   EFFECTIVE DATE

95.     The Effective Date of this Consent Decree shall be the date upon which the Court enters the Consent Decree or a motion approving the Consent Decree, whichever occurs first, as recorded on the Court's docket; provided, however that NYCHA agrees that it is bound to perform the actions described in paragraphs 67 to 70 after the execution of this Consent Decree without waiting for the occurrence of the Effective Date.

## XIX.   MODIFICATION

96.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  To the extent that the Parties propose to modify paragraphs 54 through 62, the City must also sign such document.

## XX.   TERMINATION

97.     After a minimum of five years from the Effective Date, any Party may petition the Court to terminate the Consent Decree, and the Consent Decree shall be terminated upon the Court's determination that (1) NYCHA has been in substantial compliance with all of its obligations (including but not limited to the requirements in paragraph 18, Performance Requirements, and Action Plans) under the Consent Decree for at least the prior twelve months;

21

and (2) NYCHA is willing and able following termination to continue to comply with the Performance Requirements and applicable law.

98.     The obligations under this Consent Decree with respect to lead, mold, heat, elevators or pests may be terminated by Court order, after a minimum of five years from the Effective Date, if (1) NYCHA and the United States consent or (2) the Court determines that (a) there has been substantial compliance with that portion of the Consent Decree (including but not limited to applicable requirements in Paragraph 18, Performance Requirements, and Action Plans) for a period of 12 months, and (b) NYCHA is willing and able to continue to comply with the Performance Requirements and applicable law related to such portion of the Consent Decree ("Partial Termination").

99.     No earlier than six months after a Partial Termination, the Monitor or any Party may petition the Court during the term of the Consent Decree for reinstatement of any obligations terminated pursuant to paragraph 98.  The Court may reinstate terminated obligations only if the petitioning Party or the Monitor establishes that there has been material degradation in NYCHA's compliance with the terminated obligations since the Partial Termination.

## XXI.     SIGNATORIES/SERVICE

100.     Each undersigned representative of NYCHA, the United States, and the City certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree.

101.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  NYCHA agrees to accept service of process by e-mail or mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXII.     INTEGRATION

102.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties and the City acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXIII.     FINAL JUDGMENT

103.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED this __ day of _____, 2018:


_____

UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:


Dated: June 11, 2018
     New York, New York

GEOFFREY S. BERMAN
United States Attorney
*Attorney for the United States*

ROBERT WILLIAM YALEN
MÓNICA P. FOLCH
JACOB LILLYWHITE
TALIA KRAEMER
SHARANYA MOHAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2800
Fax:   (212) 637-2702
Email: robert.yalen@usdoj.gov
      monica.folch@usdoj.gov
      jacob.lillywhite@usdoj.gov
      talia.kraemer@usdoj.gov
      sharanya.mohan@usdoj.gov

FOR NYCHA:


Dated: June *11*, 2018
       New York, New York

STANLEY BREZENOFF
Interim Chair and Chief Executive Officer
New York City Housing Authority

250 Broadway
New York, NY 10007
Tel.:  (212) 306-3434
Email: stanley.brezenoff@nycha.nyc.gov

FOR THE CITY OF NEW YORK:

Dated: June 2, 2018
     New York, New York

                               ZACHARY W. CARTER
                               Corporation Counsel
                               *Attorney for the City of New York*

                               GEORGIA PESTANA
                               First Assistant Corporation Counsel

                               100 Church Street
                               New York, New York 10007
                               Tel.:    (212) 356-1000
                               Fax:    (212) 356-1148
                               Email: zcarter@law.nyc.gov
                                        gpestana@law.nyc.gov

26

# Exhibit A to Consent Decree

...using Authority

*& Capital (Mayoral Only)*

| Funding | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 | FY27 | TOTAL FY18-FY27 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forgone Revenue | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 105,450,000 | $ 1,054,500,000 |
| City Tax Levy | $ 127,424,609 | $ 123,768,582 | $ 124,365,233 | $ 114,720,995 | $ 114,761,919 | $ 73,307,856 | $ 73,307,856 | $ 73,307,856 | $ 73,307,856 | $ 73,307,856 | $ 971,580,618 |
| Capital | $ 483,236,000 | $ 423,575,000 | $ 179,122,000 | $ 86,000,000 | $ 136,000,000 | $ 136,000,000 | $ 136,000,000 | $ 136,000,000 | $ 136,465,000 | $ 137,944,000 | $ 1,990,342,000 |
| | $ 716,110,609 | $ 652,793,582 | $ 408,937,233 | $ 306,170,995 | $ 356,211,919 | $ 314,757,856 | $ 314,757,856 | $ 314,757,856 | $ 315,222,856 | $ 316,701,856 | $ 4,016,422,618 |

NYCHA's budget as of 5/10/18. Capital will be reforecast every fiscal year to account for what NYCHA has actually committed. The remaining funding is rolled to the following fiscal year or subsequent fiscal years.

> **TESTIMONY FROM NYCHA GENERAL MANAGER VITO MUSTACIUOLO**
> *PROPERTY MANAGEMENT IN NYCHA*
> **COMMITTEE ON PUBLIC HOUSING**
> **TUESDAY, APRIL 24, 2018 – 10:00 AM**
> **COUNCIL CHAMBERS, CITY HALL, NEW YORK, NY**

Chair Alicka Ampry-Samuel, members of the Committee on Public Housing, and other members of the City Council: good morning. I am Vito Mustaciuolo, NYCHA's General Manager. I am pleased to be joined by Cathy Pennington, Executive Vice President (EVP) of Operations, and Carolyn Jasper, Vice President of Public Housing Operations. Thank you for this opportunity to discuss how we maintain and repair the homes of the hundreds of thousands of New Yorkers who live in public housing, and how we provide vital services to offer residents many pathways for opportunity.

Through NextGeneration NYCHA, our long-term strategic plan, we are strengthening our organization and striving to become a more efficient and effective landlord, delivering quality property management and repair services to all of our residents.

Now I'd like to turn things over to my colleague, Executive Vice President of Operations Cathy Pennington.

*The Authority's Size and Scope*

Thank you, General Manager Mustaciuolo. Before I go into details about property management at NYCHA, it's helpful to discuss the Authority's size and scope, and how it's organized.

NYCHA operates 175,000 apartments in more than 2,400 buildings in 325 developments in every borough that are home to about 400,000 New Yorkers.

1

NYCHA's workforce totals more than 10,800 full-time employees, nearly a quarter of whom are residents and about two-thirds of whom work in Operations, providing services for our residents. We currently have:

- More than 250 property managers and assistant managers, responsible for the overall operation of developments;
- More than 300 property maintenance superintendents and assistant superintendents, who strive to keep our developments clean and in good condition;
- Over 400 housing assistants, who help residents with administrative matters;
- About 3,000 caretakers, who clean floors, take out trash, and maintain grounds;
- Nearly 800 maintenance workers, who perform basic repairs; and
- More than 1,000 staff who work in 25 different skilled trades, including carpenters, painters, plasterers, plumbers, glaziers, electricians, exterminators, and roofers.

Several members of the Operations property management team are here today. Right now, their 7,000-plus colleagues are working to ensure safe, clean, and connected homes for our residents. The Operations team is truly the backbone of this agency, and I'd like to thank them for their dedication to the NYCHA community. I would also like to thank our residents in attendance today to speak about how they work with our property management staff.

Property management at NYCHA does not take a "one-size-fits-all" approach. Our developments range in size from nearly 2,200 units at Baruch Houses in Manhattan to 13 units at College Point Rehab in Queens. We have buildings that exclusively house seniors, and others that serve working families. More than two-thirds of NYCHA's residents are seniors and children under the age of 18. We also provide housing to veterans and formerly homeless households. We have

2

developments at the easternmost edge of Queens, along Coney Island Channel in Brooklyn, and in the northern Bronx, near the border of Westchester County.

*Development Staffing*

Our developments are divided into six portfolios, each with a director and several regional asset managers, or RAMs. This management team leads our property management staff in addressing challenges, improving operations, and providing quality customer service to our residents.

Our developments are led by a property manager along with property maintenance superintendents, supervisors of grounds and caretakers, maintenance staff, and housing assistants. The staffing structure varies depending on the size of each development. The amount of staff varies as well and is based on the number of units at each development and our available budget. For instance, the budget allows 1 caretaker for every 57 units and 1 maintenance worker for every 224 units.

*Delivering Services to Residents*

This property management team is responsible for many different functions at our developments, including:
- Routine maintenance of grounds and buildings and trash management;
- Routine apartment inspections and basic repairs in units;
- Coordination of move-outs and new rentals, including preparing vacant apartments for new residents and conducting rental interviews;
- Administration and enforcement of leases, including working with residents delinquent on rent, appearing in court, and assisting residents with annual reviews;
- Communication with resident association leaders, local NYPD precincts, elected officials, and other members of the community; and

3

- Making resident referrals to programs that bolster self-sufficiency and other vital resources.

In addition to staff based at the developments, NYCHA's skilled trades staff – plumbers, plasterers, roofers, and others – serve all developments in a portfolio. Our planning units work with developments to schedule skilled trades work. This is a complex job because one repair, such as a leaky pipe, involves multiple skilled trades.

Additionally, our support services team maintains building systems, such as heating plants and elevators, and responds to after-hours emergencies.

*NYCHA Property Management by the Numbers*

Here are some examples of what our property management, skilled trades, and support services teams accomplished last year:

- Responded to 2.7 million maintenance and repair requests, including 386,000 after-hours or emergency repairs;
- Conducted nearly 2,000 boiler inspections and completed about 4,800 boiler repairs;
- Maintained over 3,200 elevators (which make over 3 million trips a day and 1 billion trips a year);
- Conducted more than 48,000 routine apartment inspections, completing nearly 70,000 work orders generated by those inspections;
- Signed leases with 4,000 new households;
- Completed nearly 142,000 annual reviews; and
- Liaised with more than 250 resident associations.

*NextGen Operations*

4

NextGen Operations, or NGO, is a new, localized property management model that puts more control over decision-making in the hands of property managers – those who know the needs of their developments best. Launched in 2015 as the Optimal Property Management Operating Model, or OPMOM, the NGO model is now in place at 129 developments, and we plan to roll it out to all developments by mid-2019.

Through NGO, property managers are empowered to independently make decisions that affect their developments. They have more control over their budgets and can make decisions about purchasing without going to central office, resulting in faster and better service for residents. NGO sites can use their budgets to create "model" buildings, upgrading and renovating common area spaces to make them more welcoming to residents.

Before a development moves to the NGO model of property management, staff are required to take courses on subjects such as budget management, property maintenance, and customer service. More than 800 property management staff have been trained, and remaining staff are scheduled to complete training over the next year.

*NGO's Impact*

Before we launched NextGeneration NYCHA, basic repairs took an average of 13 days to complete. We've brought that number down to four days across the portfolio. At our NGO developments, basic repairs are completed even faster – in 3.6 days. NGO sites complete emergency repairs and apartment turnovers about 20 percent faster than non-NGO sites, and they have approximately 15 percent fewer open work orders.

*Streamlining and Improving Operations*

5

NGO is just one way that we are making progress. We have launched a number of other initiatives to improve customer service and quality of life for residents:

- We're stretching our limited dollars to get more work done by increasing staff's ability to use contracts for specific services, such as painting, compactor chute cleaning, and exterior lighting repairs. The goal is to reduce work order backlog, increase timely responses to repairs, and provide greater flexibility to focus on what is most urgent.

- As part of our commitment to enhanced routine cleaning, staff at our developments are covering more ground – literally – using new, efficient floor-cleaning machines.

- We've equipped employees with smartphones, enabling them to open and close work orders while getting resident sign-off on the work.

- Through our development-based skilled trades initiative, we are testing a model that assigns skilled trades – carpenters, plasterers, and painters – to specific developments. This allows developments to do their own scheduling for these trades, rather than working with the central borough office. The goal is to make scheduling and assignment of the trades more efficient, ultimately cutting down on repair times.

- We've streamlined the process for creating work orders for court-ordered repairs so that this important work can be completed faster.

- We installed digital kiosks at every property management office, enabling residents to take advantage of NYCHA's online services, such as paying rent, requesting repairs, and recertifying income.

- Through new interactive tools on our website, residents and the public can track NYCHA's progress on repairs and construction.

*Flexible Operations (FlexOps)*

The Flexible Operations program, or FlexOps, is another way we are improving quality of life for residents. NYCHA is a 24/7 operation, but it is run from 8 a.m. to 4:30 p.m., Monday through Friday, unlike most private landlords. As a

6

departure from that model, FlexOps enhances service delivery through expanded, staggered work shifts.

Launched in 2016, FlexOps is now at 11 consolidations. The initiative provides more flexibility for employees; for residents, it provides cleaner buildings and after-hours meetings with property management.

In surveys conducted last fall, 18 percent more residents rated their building conditions as "excellent, very good, or good" since FlexOps was implemented at their development.

*Engaging Residents*

Property management staff are our ambassadors, and they play a critical role in making sure residents are aware of and connected to programs and services available through NYCHA and our partners. For example, staff use our web-based referral system to connect residents to financial counseling when they need help with budgeting in order to pay their rent; they work with our community and senior center sponsors on health and recreational resources for residents; and they participate in resident-led development projects that improve the quality of life for all residents. Our three Digital Vans travel the city, providing residents internet access and technology to search and apply for jobs, complete schoolwork, and access government resources.

*Significant Challenges*

We acknowledge that there is more work to be done to provide residents the quality of life they deserve. But it must be noted that we are operating under significant constraints. Our buildings are old and deteriorating – the majority of them are more than a half century old. At the same time, we have been shortchanged $3 billion in federal operating and capital funding since 2001 to address our aging properties' vast maintenance and repair needs. However, our

7

Mayor and this Council recognize the importance of preserving and strengthening public housing, and we thank you for your unprecedented and continued support.

As I step into this new role, I'm looking at NYCHA's operational challenges with a fresh lens, trying to get to the bottom of our most persistent problems so that we can identify effective and practical ways to improve. Our goal is to provide quality customer service to our residents. While many staff at NYCHA excel at customer service – going the extra mile for residents every day – we acknowledge that maintaining consistently high levels of customer service across the Authority is an area we must improve.

While we have a system in place for tracking the requests and status of maintenance and repairs, we recognize that there are gaps in our processes that lead to complaints of work not being completed or repairs taking too long to complete.

Our data show that sometimes repairs are not made because a resident is not home when staff arrive to make repairs. We can improve this through better communication with residents about scheduling and by holding staff accountable to demonstrate that they went to the apartment at the scheduled time.

A related challenge is improving communication with residents about the status of repairs. When a maintenance worker schedules a skilled trade, such as a plumber, to complete a repair, the resident may not be informed that the next repair job has been scheduled.

Compounding this problem is the fact that it often takes a number of weeks before a skilled trades repair can be scheduled, due to a shortage of staffing and an extensive backlog of work orders. We are all dismayed by the reports of unacceptable apartment conditions – residents living with holes in their walls that haven't been repaired, or repair jobs that are half-finished. Often these

8

situations occur because of the shortage of skilled trades staff available to finish the repairs and the challenge of scheduling multiple trades for one repair. For example, repair of a leak in the wall requires coordination with a number of different staff: a maintenance worker to confirm the leak and identify the source; a plumber to fix the leak; a plasterer to repair the wall; and a painter to paint the newly plastered wall.

To put this problem in perspective, right now we have a backlog of 32,000 paint jobs and 24,000 carpentry jobs. Put another way, each month an average of 16,200 work orders requiring plumbers, plasterers, and carpenters are created, but due to our staffing levels, we are only able to complete approximately 15,600 of those. One of our goals is to reduce this backlog and improve the timeliness of complex repairs.

However, when repairs are made, our quality assurance inspections show that about 95 percent are done satisfactorily. And last year, we responded to nearly 2.7 million work orders, including about 169,000 paint and 66,000 plaster work orders.

Decades of underfunding has meant decades of deferred maintenance and investment in our buildings, resulting in enormous capital needs. That makes repairs more complex, costly, and time-consuming. We also face challenges stemming from repeat vandalism of doors and elevators. Trash management is another major issue at many of our developments, and we are working to find effective solutions that will keep our developments clean and cut down on the amount of time staff spend dealing with trash-related problems. We appreciate the support from the City that is enabling us to address some of these issues.

These are just a few of the areas we plan to focus on, though we recognize we have many other challenges affecting our residents' quality of life. We must strive to be a more efficient landlord and focus on providing quality customer service to our residents.

9

To that end, we are rolling out NGO to all our developments, piloting FlexOps at select developments, using contract services to get more work done, and evaluating our development-based skilled trades pilot. We are reviewing our policies and procedures related to work orders and communication with residents, with a goal of reducing the number of work orders closed without work being done. After this winter's heating crisis, we are undertaking a comprehensive assessment of our heating operations – our procedures related to maintenance and outages, our staffing, and our use of data to inform planning and preventive maintenance.

*Conclusion [GM Mustaciuolo]*

Thank you, EVP Pennington.

Property management is our core business. Under NextGen NYCHA and with NextGen Operations, we are working to improve residents' quality of life with more efficient repairs and connections to invaluable services.

However, the steady, decades-long decline in federal funding imperils our work and the progress we're making. Please stand with us as we continue advocating for the increased operating funding NYCHA desperately needs from Washington.

Thank you for your support as we create safe, clean, and connected communities; we want to continue the dialogue on how we can work together to best serve residents. We are happy to answer any questions you may have.